[Civ. No. 1012. Fourth Appellate District.—September 22, 1932.]

RANCHO SANTA MARGARITA (a Corporation), Respondent, v. COUNTY OF SAN DIEGO, Appellant.

Stephen Connell and Thomas Whelan, District Attorneys, and E. S. Lovett and E. I. Kendall, Deputies District Attorney, for Appellant.

Hunsaker & Cosgrove for Respondent.

MORTON, J., *pro tem.*—The assessed valuation of a portion of plaintiff's ranch in San Diego County, as determined by the county assessor, was raised by the board of equalization of the county in July, 1929, after a hearing on the matter of which plaintiff had due notice. The raise in assessed valuation increased plaintiff's taxes $20,479.25. Under written protest as provided in section 3819 of the Political Code, plaintiff paid all its taxes for the year 1929–30 and brought suit for a refund of $20,479.25. It alleged the action of the board of equalization was illegal and void. Defendant county duly answered, the action was tried without a jury, and judgment was for the plaintiff, from which defendant appeals.

The findings show that Tax Factors, Inc., pursuant to an agreement with the board of supervisors, made a survey and valuation of all real property located within San Diego County and filed with the board a series of schedules showing their appraised values, which schedules included the lands of the plaintiff. That prior to July 1, 1929, the county assessor, in the preparation of his assessment-roll for the fiscal year 1929–30, placed a valuation of 40% of the value fixed by the report of Tax Factors, Inc., on all the real property in the county. That on the 15th of July,

1929, the board of supervisors, sitting as a board of equalization at a regular meeting of which plaintiff had notice, adopted the following resolution:

"Whereas, the lands of the Santa Margarita Rancho y Los Flores, have been valued for the purpose of tax assessment by the Tax Factors, Inc., and

"Whereas, Such valuation was made upon a basis of discounting any available water service or supply possible for the coast lands of reasonable immediate development; and

"Whereas, This board, acting as a board of equalization, has reviewed the lands of said Rancho and made particular inquiry and examination into values at which these lands may be readily sold, and gathered testimony and data showing that the same are greatly undervalued; and

"Whereas, It is the opinion of this board that there is sufficient justification, if the lands were handled with regard to the highest utility, to greatly increase the appraised values of certain land over that figure placed by Tax Factors, Inc.;

"Therefore, Be It Resolved: That that part of the coastal plane within the boundaries of the Santa Margarita Rancho and lying between the San Luis Rey River on the south, the Pacific Ocean on the West, and more particularly described as follows: Sections 4, 5, 6, 8, 9, 10, 11, 14, 15, 16, 22, Township 11 S., R. 5 W., containing 3260 acres of arable land, within Oceanside school district, as shown on the assessor's books of San Diego County, be raised the sum of $64 per acre, assessed value or a total assessed valuation of $208,640.00.

"That lands lying along the Pacific ocean within the Santa Margarita Rancho, and more particularly described as follows: Sections 18, 19, 20, 29, 30, 31, 32, 33, Township 10 S., R. 5 W., and Sections 2, 3, 4, 10, 11, 12, 13, 14, 23, 24, 25, Township 10 S., R. 6 W., containing 7640 acres arable land within West Fallbrook, DeLuz and Libby school districts, as shown on the assessor's books of San Diego County, be raised the sum of $46 per acre assessed value, or a total assessed valuation of $351,440;

"That lands lying along Pacific ocean within the Santa Margarita Rancho and more particularly described as follows: Sections 19, 29, 30, Township 9 S., R. 6 W., and Sections 13, 14, 15, 22, 23, 24, 25, Township 9 S., R. 7 W., con-

taining 1370 acres arable land, within San Onofre school district, as shown on the assessor's books of San Diego County, be raised the sum of $58.40 per acre, assessed value, or a total assessed valuation of $80,008.

"Be It Further Resolved: That the proper authorized official be and is hereby authorized to make such computations and adjustments as will be necessary to conform to the order as above set forth, and apportion the amounts to the various sections listed as hereinabove set forth, in accordance with the arable lands suitable for subdivision, as they may appear upon the records of the classification of such lands as prepared for this board by Tax Factors, Inc.

"Mr. Hurley: Mr. Chairman, in requesting the Board's representative, Mr. Mueller to compile these figures he was also requested, and I notice it was left out, that there be an increased valuation on the lands adjoining West Fallbrook, the dry farming land, along the lines at Morra to conform more readily with the lines on the outside of the ranch which we find it does not do, therefore I add to that resolution that the value of ten per cent be placed upon the so-called dry farming lands along that line."

That after some discussion among the members of the board, the resolution, with this addition, was unanimously adopted. Following this action, or early in the morning of the 16th of July, 1929, the board of equalization duly and regularly adjourned as a board of equalization for the year 1929. That pursuant to the foregoing resolution the assessment-roll was amended on or about July 17, 1929, to show the valuations fixed by the board of equalization on the parcels of land specified therein; that the assessments or valuations so entered on the assessment-roll were supplied and furnished to the deputy county assessor making the entries by one Richard W. Miller, a person then in the employ of the board of supervisors. Finding VII further holds:

"That there is not in the records of Tax Factors, Inc., nor in any official records of said County of San Diego, any classification sheets or classification plats or other records or data containing any reference to, or indicating the extent or location of, the arable lands in said sections referred to in said resolution of July 15, 1929, or the lands suitable for subdivision purposes whether arable or not. That said

Richard W. Miller, in preparing the figures constituting the assessments or valuations so entered on said assessment roll, on, to wit, the said 17th day of July, 1929, by said Gordon R. Sears (a Deputy County Assessor) and appearing in said schedule No. Two (2) of said Exhibit 'A' under said title 'Valuation by Board of Equalization,' relied upon the classification plats of the Tax Factors, Inc., and his own knowledge of the location and slopes of said lands, and in ascertaining arable lands suitable for subdivision relied partly upon his individual knowledge, judgment and discretion in determining what lands were arable and what arable lands were suitable for subdivision purposes.''

The remaining findings of fact and conclusions of law will be set out *verbatim*.

"IX.

"That thereafter, and subsequent to said 17th day of July, 1929, and subsequent to said adjournment of July 15, 1929, of said Board of Equalization for the year 1929, said Board of Supervisors on, to wit, July 22, 1929, without notice to the plaintiff of its intention then and there so to do, and without any notice to the plaintiff, and without the knowledge of the plaintiff, held a meeting and transacted business as a Board of Equalization, and at such meeting passed and adopted, as a Board of Equalization, a resolution reading as follows:

" 'Whereas, on July 15th, 1929, the Board of Supervisors sitting as the Board of Equalization made its resolution raising the assessment of certain lands mentioned therein, and being in the Santa Margarita Rancho y Los Flores, and

" 'Whereas, that portion of the original resolution raising the assessment 10% on those lands adjacent to West Fallbrook, "the Moro" and other places, which were specified by Tax Factors, Inc., as dry farming lands, is incapable of definite ascertainment, and the said lands not being classified by Tax Factors, Inc., as "dry Farming" lands, said portion of the original resolution is hereby rescinded.

" 'Whereas, the resolution as written did not correctly state the intention of this Board, it is, therefore on motion of Supervisor Hurley, seconded by Supervisor Aul ordered that said resolution, be, and the same is hereby corrected, in order to state the true intention of this Board, to read as follows:

" 'Whereas, The lands of the Santa Margarita Rancho y Los Flores, have been assessed for taxation purposes by the County Assessor, and

" 'Whereas, Such assessment was made upon a basis of discounting any available water service or supply possible for the coast lands of reasonable immediate development, and

" 'Whereas, This Board, acting as a Board of Equalization has reviewed the lands of said Rancho and made particular inquiry and examination into values at which these lands may be readily sold, and gathered testimony and data showing that the same are greatly undervalued, and has heard the testimony of the witnesses herein, and having considered the same. It is the opinion of this Board that if the lands were handled with regard to the highest utility, the assessed values of certain land over that figure placed by the County Assessor, should be greatly increased, therefore

" 'Be It Resolved: That that portion of the coastal plane within the boundaries of the Santa Margarita Rancho lying between the Southeasterly boundary of said Rancho on the South, the Pacific Ocean on the West and the Orange-San Diego County line on the North, and more particularly described as follows: Sections 4, 5, 6, 8, 9, 10, 11, 14, 15, 16, 22, Twp. 11 South, Range 5 West, containing 3260 acres of arable land, within Oceanside school district, as shown on the Assessor's books of San Diego County, be raised the sum of $64.00 per acre, assessed value, or a total assessed valuation of $208,640.00. That lands lying along the Pacific Ocean within the Santa Margarita Rancho, and more par-' ticularly described as follows: Sections 18, 19, 20, 29, 30, 31, 32, 33, Twp. 10 South, Range 5 West, and Sections 2, 3, 4, 10, 11, 12, 13, 14, 23, 24, 25, Twp. 10 South, Range 6 West, containing 7640 acres arable land, within West Fallbrook, DeLuz and Libby School District, as shown on the Assessor's Books of San Diego County, be raised the sum of $46.00 per acre assessed value, or a total assessed valuation of $351,440.00.

" 'That land lying along the Pacific Ocean within the Santa Margarita Rancho, and more particularly described as follows: Sections 19, 29, 30, Twp. 9 South, Range 6 West, and Sections 13, 14, 15, 22, 23, 24, 25, Twp. 9 South, Range 7 West, containing 1370 acres arable land, within San

Onofre School District, as shown on the Assessor's Books of San Diego County, be raised the sum of $58.40 per acre, assessed value, or a total assessed valuation of $80,008.00.

"'Be It Further Resolved, That the proper authorized official be, and is hereby authorized to make such computations and adjustments as will be necessary to conform to the order as above set forth, and apportion the amounts to the various sections listed as hereinabove set forth, in accordance with the arable lands suitable for subdivision, as they may appear upon the records of the classification of such lands as prepared for this Board by Tax Factors, Inc.'

"X.

"That subsequent to the adoption of said resolution of July 22, 1929, no alterations were made or entered in said assessment book or assessment roll relating to any parcel of real property of the plaintiff and no change or alteration in said assessment roll or assessment book concerning valuations of any parcel of said real property of the plaintiff was made by the Clerk of the Board of Supervisors of said county or by any other person, upon the authorization of said resolution of said Board of Equalization, other than said alterations made on said 17th day of July, 1929, as herein found, pursuant to said resolution of July 15, 1929.

"XI.

"That the alterations and changes made in said assessment book or assessment roll of the assessments or assessed valuations of the various parcels of real property of the plaintiff described in said Schedule No. Two (2) of said Exhibit 'A' from the amounts and valuations shown under the heading 'Valuation by Assessor' to the amounts and valuations shown under the heading 'Valuation by Board of Equalization,' made on, to wit, the 17th day of July, 1929, as herein found, are discriminatory, lacking in uniformity, and illegal, and were made pursuant to a systematic, arbitrary, wilful and intentional scheme and method adopted by said Board of Equalization of discriminating against said parcels of real property of the plaintiff and in favor of other real property of like character similarly situated.

"XII.

"That neither under the terms of said resolution of July 15, 1929, and July 22, 1929, nor of any other act or order of

said Board of Equalization for the year 1929, did said Board equalize or attempt to equalize, the valuation of the parcels of real property of the plaintiff, mentioned in said Schedule No. Two (2) of said Exhibit 'A', that is to say, said Board did not compare the individual assessments of said real property of the plaintiff appearing upon said assessment roll with the assessments upon the roll of like property similarly situated and make them equal with each other, but, on the contrary, said Board of Equalization, according and pursuant to a systematic, arbitrary, wilful and intentional scheme and method adopted by it to re-assess said properties of plaintiff at greatly increased valuations, and for the purpose of increasing the assessed valuation of the real property of the plaintiff in an amount in excess of Six Hundred Forty Thousand Dollars ($640,000.00), caused certain real properties of the plaintiff to be divided into four groups or zones, three of said groups or zones consisting of real property lying contiguous or adjacent to the Pacific Ocean in said County, and the fourth group or zone lying in the vicinity of the City of Fallbrook in said County.

"That said Board of Equalization, pursuant to said scheme and method, arbitrarily apportioned said sum in excess of Six Hundred Forty Thousand Dollars ($640,000.00) among said four zones or groups as follows:

"1. Against certain real property lying in Zone No. 1, situated within the Oceanside School District in said County, consisting of approximately eleven (11) sections, the sum of approximately Two Hundred Eight Thousand, Six Hundred Dollars ($208,600.00).

"2. Against certain real property lying in Zone No. 2, situated within the West Fallbrook, DeLuz and Libby School Districts in said county, consisting of approximately twenty (20) sections, the sum of Three Hundred Fifty-one Thousand, Four Hundred Dollars ($351,400.00).

"3. Against certain real property lying in zone No. 3, situated within the San Onofre School District, in said county, consisting of approximately ten (10) sections, the sum of Eighty Thousand Dollars ($80,000.00).

"4. Against certain real property in Zone No. 4, situated within the Moro and West Fallbrook School Districts, in said county, consisting of certain parcels of dry farming lands of the plaintiff at no time definitely ascertained or

identified by said Board of Equalization, a sum of money incapable of definite ascertainment from the evidence in the case.

## "XIII.

"That before adopting said resolution of July 15, 1929, providing for said increased assessment on said parcels of land of the plaintiff described in said Schedule No. Two (2) of said Exhibit 'A', the said Board of Equalization determined to increase the valuation placed by said Tax Factors, Inc., upon the real properties of the plaintiff described in said Schedule No. One (1) of said Exhibit 'A', and commonly known as the Santa Margarita Ranch, in an amount in excess of One Million, Six Hundred Thousand Dollars ($1,600,000.00) and to increase the assessment placed by the County Assessor upon said real properties of the plaintiff in an amount in excess of Six Hundred Forty Thousand Dollars ($640,000.00).

## "XIV.

"That the amount of taxes levied by the said County of San Diego upon the said assessments of all of said real property described in said Schedule No. One (1) of said Exhibit 'A' is the sum of Fifty-two Thousand, One Hundred Thirty-Two and 09/100 Dollars ($52,132.09).

"That the amount of taxes levied by said County of San Diego upon the said assessments appearing in said Schedule No. Two (2) of said Exhibit 'A', under the heading 'Valuation by Board of Equalization' is in the amount of Twenty Thousand, Four Hundred Seventy Nine and 25/100 Dollars ($20,479.25) in excess of the amount of taxes that would have been levied by said County of San Diego, upon the said assessments made by said County Assessor and appearing in said Schedule No. Two (2) of said Exhibit 'A' under the heading 'Valuation by Assessor.'

"That by reason of said changes and alterations made, as herein found, in the assessed valuation of the County Assessor of said properties of the plaintiff described in said Schedule No. Two (2) of said Exhibit 'A' the amount of taxes levied by said county against said properties of the plaintiff was increased in the amount of Twenty Thousand, Four Hundred Seventy Nine and 25/100 dollars ($20,479.25).

## "XV.

"That heretofore, to wit, on or about the 18th day of November, 1929, at a time after said assessment book had been received by the Tax Collector of said county and the taxes upon said properties of the plaintiff had become payable, the plaintiff herein, against whom said property was assessed, claiming that said assessment was void in part, that is to say, that that portion or part of said taxes in the sum of Twenty Thousand, Four Hundred Seventy Nine and 25/100 Dollars ($20,479.25) was void, paid to said Tax Collector of said defendant under protest in writing, specifying that a part of said assessment was void, and indicating said portion claimed to be void and specifying the grounds upon which such claim was founded, said assessment, in the sum of Fifty-two Thousand, One Hundred Thirty-two and 09/100 Dollars ($52,132.09). That contemporaneously with the payment of said sum of Fifty-two Thousand, One Hundred Thirty-two and 09/100 Dollars ($52,132.09), plaintiff filed said protest in writing with said County Tax Collector. That a copy of said 'Payment of Taxes Under Protest' is attached to said complaint, marked 'Exhibit A', and made a part thereof. That reference is hereby made to said protest marked Exhibit 'A' and by such reference, the same is incorporated in these findings and made a part hereof as though in this paragraph fully set forth.

## "XVI.

"That no part of said sum of Twenty Thousand, Four Hundred Seventy-Nine and 25/100 Dollars ($20,479.25) has been paid or refunded by said defendant to plaintiff.

## "Conclusions of Law.

"From the foregoing facts, the court concludes as a matter of law:

"1. That the resolutions of the Board of Equalization, dated July 15, 1929, and July 22, 1929, are void.

"2. That the plaintiff is entitled to judgment against the defendant in the sum of Twenty Thousand, Four Hundred Seventy-Nine and 25/100 Dollars ($20,479.25).

"3. That the plaintiff is entitled to its costs incurred herein.

"Let Judgment be entered accordingly.

"October 24, 1930."

The theory of plaintiff's case is that the action of the assessor was legal but that the action of the board of equalization in adopting the resolutions of July 15, 1929, and July 22, 1929, is illegal, because the evidence shows that the board by its action attempted to reassess the property; that they delegated to another person the powers which the board alone is authorized to exercise; that the evidence shows that the plan of the board of equalization was to reassess the property without regard to the assessed value of like lands similarly situated; that they assessed against plaintiff, property not listed on the assessment-roll; and that, as stated in respondent's brief, the changes made in the assessor's figures, "pursuant to the direction of the resolutions, result in wholesale discriminations among like properties similarly situated, so considerable (in some instances where the parcels are contiguous) as to shock one's sense of justice and conception of equality and to make the inference irresistible that the discrimination is the result of 'unfairness and oppression, either through design or through such gross error or negligence as to amount to the equivalent of fraud.' "

Defendant contends that neither the complaint states facts sufficient to constitute a cause of action nor does the evidence prove one. It appears that the Rancho Santa Margarita, up to the time of the assessment in question, had never been accurately surveyed. It had been assessed for many years by arbitrary sections established by "Guesswork". No map of the rancho, arbitrary or otherwise, was in the assessor's office. In the past the owners had acquiesced in this method of assessment and admitted that no owner knew just how many acres there were in the entire rancho. The portion involved here comprised about 17½ miles of land along and adjacent to the Pacific Ocean. The number of acres shown in these fractional sections bordering on the ocean, on the 1929 assessment-roll differ from the number of acres shown in these same sections on the map made by Tax Factors, Inc. It is admitted by appellant that "the assessor used the Tax Factor valuation of these fractional sections as found by Tax Factors, but did not correct his roll to show the number of acres in each fractional section as found by the Tax Factors." Consequently some of the fractional sections included in the resolution of July 15,

1929, contain a larger acreage than appears on the assessment-roll, as made up by the assessor. It is also admitted that three fractional sections were included in the resolution which were not upon the assessment-roll. It is conceded by appellant that inequalities do exist by reason of the raise in assessed valuation of this land, but that such inequalities, when compared to the large quantity of land covered by the resolution of the board of equalization, are insufficient to sustain a charge of fraud against the board and render their action void.

It is a fundamental rule that a tax, to be valid, must be equal as to its burdens and uniform as to its operation. Property must be assessed according to a just and uniform standard of value and the rate must be levied uniformly. In considering the validity of a revenue law it is immaterial whether the inequality or lack of uniformity in the levy is the result of design, accident or inadvertence.

"What the taxpayer is entitled to is the exercise of good faith and fair consideration on the part of the taxing power in assessing his property, at the same rate and on the same basis of valuation as that applied to other property of like character and similarly situated. Inequality of taxation is produced as surely by inequality of valuation as by inequality of the rate of tax." (*Birch* v. *County of Orange*, 186 Cal. 736, 741 [200 Pac. 647, 649].)

Referring to the last paragraph of the resolution of the board of equalization of July 15, 1929, we find: "That the proper authorized official be and is hereby authorized to make such computations and adjustments as will be necessary to conform to the order as above set forth, and apportion the amounts to the various sections listed as hereinabove set forth, in accordance with the arable lands suitable for subdivision, as they may appear upon the records of the classification of such lands as prepared for this Board by Tax Factors, Inc." Appellant urges that this reference only required certain mathematical calculations for the clerk to make the changes ordered on the assessment-roll because all the evidence and records were before the board of equalization at the hearing. Respondent contends that the board of equalization did not determine the amount to which the assessment would be

increased in each of the 40 sections affected, but delegated this power to one Richard W. Miller to exercise his own judgment and discretion respecting the amount of arable lands and the amounts suitable for subdivision purposes in each of the sections concerned. Mr. Miller was a civil engineer employed by the board of supervisors as their agent on the contract of Tax Factors, Inc., to see that the specifications covering the work were properly executed. He had also been made a deputy county assessor. He testified that he made the computations referred to in the last paragraph of the resolution of July 15, 1929, not at the request of the county clerk or any deputy county clerk, but pursuant to this resolution which he had assisted in preparing. How he made these computations and arrived at the figures which he entered on the assessment-roll therefore becomes material. Referring to his testimony we find he only used the classification plats of Tax Factors, Inc. On these plats the soil types were shown but no reference was made to arable lands or lands suitable for subdivision purposes. As to the first paragraph of the resolution dealing with definite sections (Zone 1) he testified that although section 6, T. 11 S., R. 5 W., was not included in the assessment-roll, he did apportion a part of the increase of $208,640 covering Zone 1 to this section. Taking up next the third paragraph dealing with definite sections (Zone 3), he stated that although sections 22 and 25, T. 9 S., R. 7 W., were not shown on the assessment-roll, yet they were included in the apportioning of the increased assessed valuation amounting to $80,008 for this zone. His testimony as to the second paragraph of the resolution dealing with definite sections (Zone 2) shows that in figuring the increase in valuation as to section 29, T. 10 S., R. 5 W., he figured on 640 acres at $46 an acre when the assessment-roll shows for this section 629 acres. For section 30, T. 10 S., R. 5 W., the assessment-roll shows 576.7 acres and he figured the increase of $46 per acre on 590 acres. For section 31, T. 10 S., R. 5 W., the roll shows 195 acres and the increase of $46 per acre he figured on 251 acres. For section 4, the roll shows 148½ acres and the increase was figured on 210 acres. For section 10 the roll shows 191.75 acres and the increase of $46 per acre was figured on 320 acres. Section 14, the roll

shows 268 acres and the increase was figured on 365 acres. Section 24, the roll shows 250.5 acres and the increase was figured on 490 acres. Section 23, the roll shows 3.6 acres and the increase was figured on 22 acres. In Zone 1, there were 72 acres in section 9 of T. 11 S., R. 5 W., known as the Tidal Marsh, and he figured the $64 per acre increase on the 72 acres because he felt it was suitable for subdivision purposes. In Section 13–9–7 (Zone 3), although it was listed as containing 252 acres of arable land on the plat, yet he figured the increase of $58.40 per acre on only 68 acres because he felt only the lands adjacent to the coast line were to be included, i. e., only those lands which he felt were subject to the "coast influence". Quoting his testimony:

"Q. In other words, in determining what lands you would place this additional valuation upon, you considered whether they were located close to the coast, or far from the coast, or whether they would be affected by what you call the 'coast influence'?

"A. Yes."

As to section 14–9–7 (Zone 3) 439 acres were shown as arable lands and the increase was figured on only 289 acres for the same reason as before. Other examples of where he was called upon to exercise his own judgment and discretion were as follows:

"Q. Isn't it a fact you included 41 acres of non-tillable washout?

"A. It might be that I did; I couldn't say. I may have just lumped the whole section, not discounting these little areas in there.

"Q. So that in that section it would look as tho you assessed non-tillable washouts at $46 an acre, plus the 80 cents, that they were uniformly assessed at thruout the county?

"A. It probably would; yes, sir. . . .

"Q. Would you kindly examine that classification plat and state how many acres in Section 3, Township 10 South, Range 6 West, according to the classification plat, have a soil type classification?

"A. 315.

"Q. Now, will you please turn to Exhibit No. 4, copy of your pencil notations, and state how many acres in that

particular section you increased in assessed value at the rate of $46 an acre?

"A. 382.

"Q. So that there were 67 acres in this section, that had no soil type classification, that were increased in assessed valuation, were there not?

"A. Apparently so, yes.

"Q. And that would be 67 acres of 'Rough Stony Land' or 'Rough Broken Land,' would it not?

"A. Yes; it would be this 'Rough Broken Land.' . . .

"Q. Now will you please state the number of acres in that section that, according to the Tax Factors' classification plat, were given a soil type classification?

"A. If I have added them up correctly, there are 479.

"Q. Now, if you will please turn to Exhibit No. 4, copy of your pencil notations, and state how many acres in that section were increased by you $46 per acre, pursuant to the directions of the resolution?

"A. 570.

"Q. So that would be approximately 90—between 90 and 95—let us say 90—acres that were increased, that had no soil type classification, would it not?

"A. 91; 90 or 91 acres.

"Q. Then, in that instance, you placed a valuation of an additional $46 on about 90 acres of 'Rough Broken Land' in this particular section, did you not?

"A. Apparently.

"Q. Why did you do that, Mr. Miller?

"A. I couldn't say. It may have been an error."

The appraised value placed by Tax Factors, Inc., on nontillable washouts throughout the county was $2 an acre, so that the assessed valuation fixed by the county assessor of forty per cent thereof would be 80 cents an acre. Rough broken land was appraised by Tax Factors, Inc., at $5 an acre which would therefore have a uniform assessed valuation throughout the county of $2 an acre. Irregularities also appear as to sand dunes, creek lands and a lagoon, all uniformly assessed throughout the county at $2 an acre, which were assessed at a rate of $48 an acre.

The evidence therefore conclusively shows that the assessed valuation of portions of the land in question was increased by Richard W. Miller, relying upon the classifi-

cation plats of Tax Factors, Inc., and his individual knowledge, judgment and discretion as to arable lands and lands suitable for subdivision purposes, through the action of the board of equalization in referring the matter to him by their resolution of July 15, 1929. Furthermore the method followed of increasing the assessed valuation by a certain amount per acre without regard to value of land nullified the equalization as between the sections.

Taxation of real property is a very serious matter, and a fair, just and uniform method must be followed in raising or lowering the assessed valuation of lands in a county. We feel that the evidence in this action supports finding XI of the trial court that the valuations fixed through the resolution of the board of equalization were ''discriminatory, lacking in uniformity and illegal''. A portion of the resolution of July 15, 1929, to wit, Zone 4, was rescinded by the resolution of July 22, 1929, because of being too indefinite and not capable of identification. After reviewing all of the evidence, we must concede that there was evidence to justify the trial court in concluding that the board of equalization had agreed upon some definite system or plan to raise the assessed valuation of respondent's land by a definite amount per acre. Without question, the method employed does not display an attempt to equalize and make uniform the assessed valuations of these lands with like property similarly situated. No matter what the evidence may have been before the board of equalization, we have before us the method adopted upon which to base the increase of the assessed valuation. Officials may act honestly and in good faith and yet where their method of increasing assessed valuations shows serious discriminations and a lack of uniformity, their action will be deemed equivalent to fraud.

'' . . . while it was not claimed that there was any actual fraud or corrupt intent on the part of the officials making and sustaining the assessment in question, there was, nevertheless, such a violation of plain duty on the part of such officials as to constitute 'fraud' or 'something equivalent to fraud,' within the meaning of those terms as used in the decisions relative to the review of the action of assessing officers, entirely regardless of the motive

actuating them in the matter of such an assessment." (*Mahoney* v. *City of San Diego*, 198 Cal. 388, at 397 [245 Pac. 189, 193].)

Under the aforegoing statement of the law we therefore hold that the evidence sustains the finding of the trial court that the action of the board of equalization resulted in inequalities of taxation constituting "fraud" or "something equivalent to fraud", as those terms have been used in the decisions relating to the action of assessing officers the boards of equalization.

The judgment is affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 20, 1932.