[Civ. No. 1066. Fourth Appellate District.—November 6, 1933.]

RANCHO SANTA MARGARITA (a Corporation), Appellant, v. COUNTY OF SAN DIEGO, Respondent.

136

Hunsaker & Cosgrove and T. B. Cosgrove for Appellant.

Thomas Whelan, District Attorney, Frank T. Dunn, Chief Deputy District Attorney, and Edward W. Goodman, Deputy District Attorney, for Respondent.

MARKS, J.—The appellant corporation is the owner of approximately 131,000 acres of land in the county of San Diego. This was originally a Spanish grant which had never been officially surveyed and divided into sections. In 1927 appellant caused a survey to be made dividing the real property into sections, which were numbered with townships and ranges to conform to a general official survey of adjoining sectionized property. A map was made and filed with the assessor of San Diego County, who used it in making the subsequent assessments of the property.

The board of supervisors of San Diego County employed a corporation known as Tax Factors Inc. to make a survey and appraisement of all of the real property in San Diego County. R. B. Hunt, an employee of Tax Factors Inc., had charge of the valuations of all rural properties in the county, including that of appellant. In September, 1929, he was appointed deputy county assessor and continued to act as such during all times material to this action.

. The method employed by Tax Factors Inc. in arriving at its valuations of real property may be briefly summarized as follows: Airplane photographs were made from an elevation of about 2,000 feet. The shadows on these photographs

showed the different kinds of soil formations in the ground below. The developed pictures were taken onto the land by engineers who were soil experts. After investigation they recorded the various characters of soils actually found. The names used for the various soils were those adopted and established by a department of the United States government. The photographs were then returned to the offices of Tax Factors Inc., and what is referred to as ''Red Line Maps'' were prepared from them. These maps each usually show a complete section or fractional section. The results of the photographs, together with the investigation of the actual soil conditions, were reproduced on these red line maps so that each area of a particular soil was definitely marked. Also such additional data as washouts, bluffs, creeks, marsh and overflow lands were equally faithfully recorded. The area of each individual tracing showing soil or other condition mentioned was determined and entered upon each red line sheet.

The red line sheets were then used for the preparation of what is called ''classification sheets''. These sheets contained a detailed description of each section. For convenience in illustration and to show the minute care with which the work was done, the material part of one is reproduced as follows:

''Rural Classification

Owner—Rho Santa Margarita, A Corp.

Description: Rho Santa Margarita

All of Sec. 24, t. 9S, R 7W,

containing 547

| | Soil Types | | | Utility | No. Acres | Value per Acre | Total Value |
|---|---|---|---|---|---|---|---|
| 1. R.B. | | | | Br. | 7 | 2 | 14 |
| 2. L F S L | #2 | Gt. Roll | | Open | 10 | 70 | 700 |
| 3. L F S L | #2 | Gt. Roll | | Imp. | 5 | 70 | 350 |
| 4. D S L | #1 | Irrig | | Imp | 180 | 278 | 27800 |
| 5. D S L | #1 | | | Open | 10 | 200 | 2000 |
| 6. D S L | #1 | Irrig | | Imp. | 10 | 281 | 5339 |
| 7. Y S L | #1 | Irrig | | Imp. | 37 | 281 | 10397 |
| 8. Y S L | #1 | | | Br | 8 | 150 | 1200 |
| 9. Creek | | | | | 45 | 5 | 225 |
| 10. Y S L | #2 | | | Imp. | 16 | 100 | 1600 |
| 11. Y S L | #6 | | | Br. | 10 | 5 | 50 |
| 12. Y C L | #1 | Irrig | | Imp. | 25 | 278 | 6950 |
| | Total Basic Value | | | | 305 | | 56628'' |

The designations for soil types, in the order in which they appear, are incorporated in the record as follows: (1) Rough, broken; (2) Los Flores Sandy Loam #2, gently rolling; (3) Los Flores Sandy Loam #2, gently rolling; (4) Dublin Sandy Loam #1, irrigation; (5) Dublin Sandy Loam #1; (6) Dublin Clay Loam #1, irrigation; (7) Yolo Sandy Loam #1, irrigation; (8) Yolo Sandy Loam #1; (9) Creek; (10) Yolo Sandy Loam #2; (11) Yolo Sandy Loam #6; (12) Yolo Clay Loam #1, irrigation.

The values of the different kinds of land, as given above, and of all others, were determined by committees, and the same values were intended to apply to all lands of similar character in San Diego County, with allowances made for location, beach influences, water supplies, highways and other similar considerations.

In making the 1929 assessments the county assessor of San Diego County accepted the valuations on the classification sheet of Tax Factors Inc. and assessed the various lands within San Diego County at forty per cent of these valuations. He again did this in his assessments of 1930.

The board of supervisors of San Diego County, sitting as a board of equalization, in July, 1929, served notice upon appellant requiring it to show cause why the assessment on its lands in San Diego County should not be raised. After a hearing, a resolution was passed raising the assessments on approximately forty sections of land belonging to appellant, being all of its lands bordering the Pacific Ocean between the Orange County line and the northerly limits of the city of Oceanside, excepting two sections and two fractional sections, and also lands near the city of Fallbrook. Appellant paid its taxes under protest and brought suit against the county for the recovery of a portion of the taxes thus paid. The action resulted in a judgment in favor of appellant, which was affirmed by this court. (*Rancho Santa Margarita* v. *County of San Diego,* 126 Cal. App. 186 [14 Pac. (2d) 588].)

In July, 1930, the board of equalization of San Diego County again summoned appellant to show cause why its assessments for the fiscal year 1930–31 should not be raised. A hearing was had which resulted in a horizontal raise of the assessments of twenty-nine sections, or fractional sections, of appellant's lands lying between the Pacific Ocean on the

west and the low-lying hills on the east, the dividing line between Orange and San Diego Counties on the north, and the northerly limits of the lands riparian to the Santa Margarita River on the south, being northerly from the northerly city limits of the city of Oceanside, excepting two fractional sections. The easterly boundary is a serrated line with points varying in distance from about one-half to one and three-quarters miles from the ocean. The figures to which the assessments of these sections were raised may be obtained by multiplying each 1930 assessment of the assessor by 2.3, and changing the last two figures of each result to zero, ten, or its nearest multiple. Appellant again paid its taxes under protest and brought this action to recover the sum of $15,627.11, which it alleged it was compelled to pay by reason of the illegal action of the board of equalization in raising the assessments on the twenty-nine sections in question. The trial court made findings in favor of respondent and entered judgment accordingly, from which this appeal is taken.

Appellant states the questions to be considered here as follows: "*First,* was the evidence before the Board of Equalization sufficient to justify the increase in the assessments? *Second,* did the Board arbitrarily reassess the plaintiff's lands without attempting to equalize the assessments of the Assessor? *Third,* did the Board's increases in the assessments destroy the uniformity of the Assessor's valuations and result in inequalities and discriminations? *Fourth,* did the trial court err in refusing to make a finding on the affirmative defense pleaded that the tax paid by the plaintiff was not more than a fair and just proportion of the taxes assessed and levied for the fiscal year 1930–1931 which plaintiff should have paid on said property."

It is not questioned that the board of equalization acts in a judicial capacity and can only change the values on evidence given before it. (*Southern Pacific Land Co.* v. *San Diego County,* 183 Cal. 543 [191 Pac. 931].) The board has no power to assess or reassess the property on the roll prepared by the assessor. In July, 1930, the board had the power to increase or lower any assessment "so as to equalize the assessment of the property contained in said roll, and make the assessment conform to the true value of such property in money" after a hearing and on evidence pro-

duced before it. (Sec. 3673, Pol. Code, as in effect in 1930; *Baldwin* v. *Ellis,* 68 Cal. 495 [9 Pac. 652].) ■ To secure equality in taxation, it is necessary that there be an equality of assessment as well as an equality of the tax rate. (*Birch* v. *County of Orange,* 186 Cal. 736 [200 Pac. 647].)

■ In actions of this kind it is not necessary for the plaintiff, in order to recover, to establish actual fraud on the part of the members of the board of equalization, or to prove a design to oppress by imposing a greater burden of taxation upon its property than is levied on other property in the county of similar character and value. However, something akin to or in the nature of fraud must be established. This may be done by evidence showing that the assessments are discriminatory and lacking in uniformity. It has been said that this kind of fraud may arise from gross error or negligence and may be proved by the circumstances of the case. (*Mahoney* v. *City of San Diego,* 198 Cal. 388, 397 [245 Pac. 189] ; *Birch* v. *County of Orange, supra*; *Wores* v. *Imperial Irr. Dist.,* 193 Cal. 609, 628 [227 Pac. 181].)

The first two questions presented by appellant are so closely interrelated that much space can be conserved by considering them together. The arguments advanced in their support may be divided into four subdivisions: (1) That there was no material and competent evidence presented before the board of equalization at the hearing in July, 1930, upon which it could legally base its resolution raising the assessment on appellant's property 230 per cent; (2) assuming that the transcript of proceedings before the board of equalization at the hearing in July, 1929, was properly received in evidence over appellant's strenuous objection, it was neither read in evidence to the board, nor was it read by its members, and was not considered as evidence by them; (3) that if it was so considered, it, with the evidence introduced at the 1930 hearing, furnished no sufficient basis for the raise of the assessments; (4) that the raise of assessments was actually made as a result of a preconceived plan and design of all the members of the board, and their judgment was a result of this plan and design, and not of the evidence presented, but in disregard of such evidence.

█ It should be observed that the evidence in the record is sharply conflicting. We have read and studied the voluminous transcript and the numerous exhibits and have endeavored to carefully analyze the evidence both before the board of equalization and before the trial court. As a result of our study we can say without hesitation that had either of those tribunals reached a contrary conclusion we could easily affirm such a judgment. No such problem confronts us. We have the judgments of two judicial bodies before us for review. We cannot reverse either because of what might seem to be a preponderance of the evidence against the conclusions there reached. We are bound by the time-honored rule that we must affirm a judgment if there is material and competent evidence in the record supporting it.

The proceedings before the board of equalization in 1929 were taken down in shorthand by a reporter and transcribed, as were those of 1930. At the second hearing, the transcript of the first was admitted in evidence over the objection of appellant. The objection made and urged both below and here, goes to the right of the board to consider the evidence on the second hearing.

Counsel have been diligent in their search for and citation of authorities but have cited none from California in which the precise question has been decided. The general rule concerning the admissibility of evidence produced before a board of equalization is stated in 61 C. J. 825, as follows: "If the statute prescribes the kind of evidence which the officer or board may hear, or on which his or its decision shall be based, it must be strictly obeyed; but otherwise the officer or board is not bound by the ordinary rules of evidence, and may hear affidavits or unsworn testimony without giving an opportunity for cross-examination; and, generally, it may admit and act upon any evidence which has a direct bearing on the question before the board or tends to prove the fact in issue. Competent evidence bearing on the question of value is admissible. Evidence as to the value of the property should be confined to its value at the time of the assessment complained of, and evidence of its value at some former time is not admissible except as a starting point from which to estimate subsequent appreciation or depreciation."

In the case of *People ex rel. Gibson* v. *Board of Assessors of Town of Pulteney,* 101 N. Y. (Supp.) 176, the only evidence presented before a board of equalization seems to have been in the form of affidavits. In commenting on the situation, the court said: "When the defendants received the affidavit of the petitioner and considered the matter they were acting judicially, and had a right to take into consideration, not only the petitioner's affidavit, but also any other information received by them upon inquiry made as to who was the owner or occupant of the property in question. They were not foreclosed by the affidavit of the petitioner. When they rendered that decision, acting judicially, they had a right to take into consideration all the information they had on the subject, including the affidavit in question, and from all of the information they had, and the facts and circumstances surrounding the case, they made up their judgment and decided that the assessment was properly made."

In the case of *Western Union Tel. Co.* v. *Dodge County,* 80 Neb. 18 [113 N. W. 805], in discussing a similar question of evidence, it is said: "Assessors and equalization boards must act (upon) the best and most reliable information at their command. Poor's Manual is resorted to by the commercial world as an authority upon the amount and value of the stocks and bonds of the several leading corporations in this country, and whatever is good evidence for those dealing in such stocks and bonds cannot be regarded as either immaterial or incompetent for the taxing authorities to act upon. Boards of equalization are not governed in their investigation of the values of taxable property by the strict rules of evidence applied by courts of law in the trial of ordinary cases."

In the early case of *Patten* v. *Green,* 13 Cal. 325, 329, in discussing proceedings before a board of equalization, the Supreme Court said: "We are not disposed to hold these tribunals to any great strictness of procedure." This rule was again announced in *Spring Valley Water Works* v. *Schottler,* 62 Cal. 69, and *Hagenmeyer* v. *Board of Equalization of Mendocino County,* 82 Cal. 214 [23 Pac. 14, 16].

In *People* v. *McCreery,* 34 Cal. 432, at 445, the Supreme Court substantially approved the reception of what must have been hearsay evidence to some of the members of the

board of equalization. It was there said: "Section two of the Act of 1862 (page 509) provides that the Board 'shall meet on the first Monday in June in each year for the correction of errors in the assessment of personal property, and shall continue in session from time to time until all such errors brought to their notice shall be corrected; provided, however, they shall not sit after the third Monday in June'. The Board met on the first and the third Mondays of June. Between those days, as we infer from the record, a committee from the Board received applications for the correction of the assessment, and perhaps took the testimony, if any was offered. We see no objection to such a course, calculated as it was to facilitate the dispatch of business. The Board, as was necessary and proper, finally acted on the applications and ordered the corrections to be made on the assessment roll.".

█ It appears from the record that in 1929 appellant was represented before the board of equalization, was afforded ample opportunity to cross-examine adverse witnesses and present evidence in its own behalf. There was evidence at the 1930 hearing that there was no material change in either the physical condition of the property or its value in the year intervening between the two hearings. Under these conditions and the relaxed rules of evidence prevailing in hearings before boards of equalization we have concluded that the transcript of the 1929 hearing was properly introduced in evidence at the 1930 hearing. (Sec. 3676, Pol. Code; *Wolfskill* v. *City Council of Los Angeles,* 178 Cal. 610 [174 Pac. 45].)

█ It is admitted that the transcript of the 1929 proceedings was not read in evidence before the board of equalization at the 1930 hearing. There is no evidence that it was not read by the individual members, or that it was not considered by them in reaching their decision at the second hearing. "The record does not show by affirmative proof that the board did not act upon evidence before it. Therefore its order in the premises is conclusive that it did act upon such evidence as was necessary. (*Humboldt County* v. *Dinsmore,* 75 Cal. 604, 607, 608 [17 Pac. 710].)" (*Hagenmeyer* v. *Mendocino County, supra.*)

It would extend this opinion to an unnecessary length to attempt to detail the mass of evidence on the question of

whether or not the evidence at the hearing of the board of equalization in July, 1930, furnished any sufficient basis for the raise in the assessment then made. This contention may be properly restated: That the resolution in question, in effect a judgment in a judicial proceeding, raising the assessment on the twenty-nine sections of appellant's land, is without evidentiary support. ▮ Here, again, we must advert to the time-honored rule that if there is any material and competent evidence in the record supporting a judgment it cannot be disturbed on appeal because of conflicting evidence.

Those lands of appellant which are involved extend from the northerly San Diego County line, the dividing line between Orange and San Diego Counties, about sixteen miles southerly along the Pacific Ocean, to near the northerly limits of the city of Oceanside. It is uninhabited except for a few isolated dwellings.

Comparisons of values and assessments were made principally with property near the subdivision of La Costa Downs. This property fronts the Pacific Ocean and lies between Oceanside and the town of Encinitas. We will refer to these lands as the La Costa Downs property.

Appellant maintains that the La Costa Downs properties "were not, by comparison with plaintiff's lands, like lands similarly situated" and therefore could not be compared with its lands either as to actual or assessed valuations. If this contention is correct, respondent's case must fail for lack of any evidence to support the judgment.

The evidence discloses that the two tracts have certain features in common and other marked dissimilarities. Both lie on what is described as a coastal plane rising from the Pacific Ocean easterly towards a range of low-lying hills which, generally speaking, parallel it. Both contain considerable mesa land fit for dry farming. Both are bisected by the state highway and Santa Fe railroad, which furnish means of ingress and egress and for transportation of crops. The climatic conditions are the same and the "view", if by any stretch of the imagination it could be considered in fixing the value of property used principally for dry farming, pasture or allowed to lie idle, is of the same Pacific Ocean, varying only in the particular waters which are visible. While the evidence on an available water supply is hope-

lessly conflicting, there is evidence which, if believed, would lead to the conclusion that there is not much difference in the prospects of bringing a supply of water on to the two tracts. Appellant introduced evidence, which in our opinion preponderates in weight, to the effect that its water supply is fully developed and is in fact failing and indicating the impossibility of bringing water on large sections of its land so that its future utility will by this fact be confined to its present use. It also presented evidence from which the reasonable conclusion might be drawn that the La Costa Downs property had available a water supply for future use. At least one witness for respondent testified that an undeveloped source of an additional and considerable water supply existed for appellant's land. This evidence was evidently accepted by the board of equalization as true and was undoubtedly believed by the trial judge who commented upon it in a written opinion. There is also evidence offered by respondent that there is actually no available water supply for considerable portions of the La Costa Downs property. Thus we have in the record either of two theories that support the conclusion that the water supplies of the two areas are similar. The first is pictured in appellant's testimony that it has available no additional water and that much of its land is thus not subject to future development, and respondent's evidence that in the La Costa Downs area an adequate water supply is not actually available and that a like condition will exist. The second theory is developed by respondent's evidence that there is available for development a considerable water supply for appellant's land, and the testimony of appellant's witnesses that water can be furnished on the La Costa Downs property.

The incidents of dissimilarity are also numerous. Appellant's property is held in a single ownership and is used by itself or by tenant farmers, while the La Costa Downs property is divided into comparatively small tracts separately owned. Appellant's property contains within its boundaries much larger areas of untillable and waste ground. It is farther from the proven and established line of march of settlement by home and farm owners in San Diego County. These and other differences that might be mentioned would more properly indicate that appellant's land should receive a lesser valuation than that the values

of the two areas could not be compared for the purpose of assessment.

It should be common knowledge that no two considerable areas in southern California possess exactly similar characteristics because of different soils and conditions. ■ The values of two properties should control in permitting comparison for assessment purposes so that the owners of properties of nearly equal values should bear a similar proportion of the cost of government. Values furnish the important factor and difference in use should not prohibit a comparison of properties of equal values. (*Wild Goose Country Club* v. *County of Butte,* 60 Cal. App. 339 [212 Pac. 711, 713].)

We shall have occasion to consider the evidence of the comparative values of appellant's and the La Costa Downs properties under appellant's third specification of error, and will not repeat it here. It is sufficient to say here that we are satisfied that a comparison of the assessed and market values of property in the two tracts was permissible under the conditions shown by the record.

■ Appellant next contends that the raise of the assessments of its property was actually made by the board of equalization, not upon a consideration of the evidence presented at the hearing, but as a result of a preconceived plan and design of all of its members, and that the matter had been prejudged by them before the hearing, and their final action was a result of this plan and design.

In approaching this question we are met by the presumption in favor of the regularity of the judgment of a court and a judicial body and the further presumption that a board of equalization acted on the evidence before it. (*Hagenmeyer* v. *County of Mendocino, supra.*) The trial court found in accordance with these presumptions and against the contention of appellant. Therefore, unless there is an entire lack of evidence or reasonable inferences to be drawn from it supporting the finding, we cannot distrub it. We need detail only such evidence as supports the finding.

When the board of equalization received the assessment records from the assessor in 1930, its members discovered that the assessor had placed the same assessed valuations on appellant's property that he had used in 1929, and had paid no attention to the increases made by that body in

1929. Instructions were given to cite appellant to show cause why its assessments should not be raised. There is little doubt that the board members then entertained the idea that assessments on the property here involved should be raised in an amount equaling the raise of the previous year. One of the members of the board who testified in the court below seemed to entertain the idea at the time of the trial that such a result had been accomplished by the resolution of July, 1930. There is nothing to show that the other members were under a similar mistaken impression.

R. W. Miller was employed by Tax Factors Inc. and assisted in the valuation of appellant's property, as well as other rural properties in the county. He later became a deputy county assessor, which office he held in July, 1930. At that time he was acting as a member of the appraisal department of the board of equalization.

The letter summoning appellant to appear before the board of equalization on Saturday, July 19, 1930, was dated July 11, 1930. Miller testified that at some time between those dates he received the following instruction from a member or members of the board: "I was told to supply a list of the sections that had been raised by the board of equalization last year, including two sections that had not been raised of that area lying outside of the riparian boundaries of the Santa Margarita, and to supply the figures on the assessed valuation as fixed on the basis of the Tax Factors' report, and also the figures as they had been raised by the board of equalization last year."

He prepared a list of the twenty-nine sections in question with the assessed valuations as fixed by the assessor for the fiscal years 1929–1930 and 1930–1931 and the amounts to which the assessments of twenty-seven of them had been raised by the board of equalization in 1929. Sections thirty-two and thirty-three in township ten south, range six west, S. B. M., had not been included in the 1929 raise but he computed what the raise would have been had the same method of increase been employed as was used in the raise of the other sections. He then made various computations to arrive at a means whereby a total increased assessed valuation of the twenty-nine sections would equal the total increased assessed valuation of the twenty-seven sections raised by the board of equalization in 1929, plus the increased valuation of the two omitted sections. He multiplied the assessed valuation of

each section, as fixed by the assessor, by the following figures: 2.72, 2.39, and 2.38. Finally, he hit upon 2.375, and by multiplying the assessor's valuation by these figures a result was reached approximating, within a few hundred dollars, that which he understood was desired by the members of the board of equalization. The hearing was not completed on Saturday, July 19, 1930, but was continued until the afternoon of the following Monday, at which time the resolution was passed. As we have indicated, the final figures of the increase are approximately obtained by multiplying the assessor's valuation of each section by 2.3. The valuations of the assessor, the raises by the board of equalization in 1929 and 1930, together with the decrease or increase of the assessed value of each section by the board in 1930 below or above its 1929 increase, and the totals, are shown in the following table:

| Sec. | Twp. | R. SBM | Assessor 1929–30 1930–31 | Board of Equalization 1929–30 | Board of Equalization 1930–31 | Board of Equalization 1930 decrease under assessment 1929–30 | Board of Equalization 1930 increase over assessment 1929–30 |
|---|---|---|---|---|---|---|---|
| 13 | 9S | 7W | 6790 | 10759 | 15620 | | 4861 |
| 14 | 9S | 7W | 39910 | 56785 | 91790 | | 35005 |
| 15 | 9S | 7W | 2790 | 7872 | 6420 | 1452 | |
| 23 | 9S | 7W | 7600 | 14257 | 17480 | | 3223 |
| 24 | 9S | 7W | 29080 | 53253 | 66880 | | 13627 |
| 19 | 9S | 6W | 9210 | 18556 | 21180 | | 2624 |
| 29 | 9S | 6W | 3760 | 6150 | 8650 | | 2500 |
| 30 | 9S | 6W | 12120 | 22340 | 27880 | | 5540 |
| 32 | 9S | 6W | 9420 | 22370 | 21670 | 700 | |
| 33 | 9S | 6W | 7270 | 17270 | 16720 | 550 | |
| 2 | 10S | 6W | 600 | 2394 | 1380 | 1014 | |
| 3 | 10S | 6W | 17200 | 34768 | 39560 | | 4792 |
| 4 | 10S | 6W | 11330 | 20992 | 26060 | | 5068 |
| 10 | 10S | 6W | 19660 | 34384 | 45220 | | 10836 |
| 11 | 10S | 6W | 28240 | 53490 | 64950 | | 11460 |
| 12 | 10S | 6W | 1330 | 12644 | 3060 | 9584 | |
| 13 | 10S | 6W | 19420 | 48258 | 44670 | 3588 | |
| 14 | 10S | 6W | 22520 | 39306 | 51800 | | 12494 |
| 23 | 10S | 6W | 280 | 1292 | 640 | 652 | |
| 24 | 10S | 6W | 14980 | 37524 | 34450 | 3074 | |
| 25 | 10S | 6W | 1320 | 4076 | 3040 | 1036 | |
| 18 | 10S | 5W | 9180 | 35404 | 21110 | 14294 | |
| 19 | 10S | 5W | 4810 | 33010 | 11060 | 21950 | |
| 20 | 10S | 5W | 1840 | 20926 | 4230 | 16696 | |
| 29 | 10S | 5W | 11870 | 41312 | 27300 | 14012 | |
| 30 | 10S | 5W | 12600 | 39740 | 28980 | 10760 | |
| 31 | 10S | 5W | 6270 | 17814 | 14420 | 3394 | |
| 32 | 10S | 5W | 15580 | 43686 | 35830 | 7856 | |
| 33 | 10S | 5W | 2560 | 32800 | 5890 | 26910 | |
| | | | 329540 | 783432 | 757940 | 137522 | 112030 |

It will be observed that whatever may have been the original intention of the members of the board of equalization as to raising the assessments to equal those it made in 1929, the results finally accomplished show a wide departure from such intention, if it were entertained. The 1930 valuation of each section is materially different from the valuations of 1929 and the totals are separated by more than $25,000. An entirely different basis of increase was employed in 1930 from that used in 1929. (See *Rancho Santa Margarita* v. *County of San Diego*, 126 Cal. App. 186 [14 Pac. (2d) 588].) At the hearing on July 21, 1930, Miller testified that he prepared the figures used in the resolution passed by the board of equalization that morning ''on order of the board, or request of the board.''

With these facts before us we cannot conclude that the board of equalization carried out a preconceived plan or design to raise the assessments of the sections involved to the same amounts as its raise in 1929. The different results reached and the different method used in arriving at the amount of the increase of the assessments relieve us of the necessity of considering the effect of the decision in *Rancho Santa Margarita* v. *County of San Diego, supra,* on the judgment in this case.

We are somewhat aided in arriving at this conclusion by the case of *Farmers' etc. Bank* v. *Board of Equalization of Los Angeles,* 97 Cal. 318 [32 Pac. 312]. The notice to the plaintiff cited it to show cause why its assessment on solvent credits should not be increased from $2,774 to $275,000. It was actually increased to $270,774. The notice on its face showed that the members of the board entertained an opinion on the approximate amount of the increase to be made by them, and the increase made was sustained by the courts. (See, also, *Security etc. Co.* v. *Board of Supervisors of Los Angeles County,* 4 Cal. Unrep. 222 [34 Pac. 437].)

 Appellant urges that the increases in the assessment of its property in 1930 destroyed the uniformity of the assessor's valuations of rural property in San Diego County and resulted in inequalities and discriminations against it in the assessments of this class of property. It confidently cites testimony concerning the Tax Factors Inc. valuations

that similar qualities of land were given a uniform basic value all over the county; that zones were uniformly established where the special influences which we have already noted changed the valuations which were raised or lowered in accordance with a uniform rule applied all over the county. It produced the assessor and some of his deputies as witnesses before the board of equalization, who testified that any raise in the assessed valuation of the twenty-nine sections in question would throw their assessments out of line with those of all other similar property in the county. There is much force to this argument. However, we are confronted with the judgments of two judicial bodies wherein conclusions in direct opposition to this contention were reached. If there is any material and competent evidence in the record supporting these judgments we cannot disturb them on appeal because of a conflict in the evidence, even though we might have reached a different conclusion had we been sitting in the place of the original trial tribunal.

The evidence on the proposition we are considering falls naturally into two classes: First, a comparison of the actual and assessed valuations of the twenty-nine sections with other property of appellant to the east; and, second, with the La Costa Downs property.

It should be observed that the assessment rolls were not introduced in evidence at either the hearing before the board of equalization or the trial in the superior court, counsel evidently being satisfied with the red line maps and classification sheets prepared by Tax Factors Inc. However, we experience no difficulty in arriving at assessed valuations from this evidence as it is undisputed that the assessor fixed his valuations at forty per cent of Tax Factors Inc. valuations on the classification sheets.

Section 3654 of the Political Code provides that the assessor shall deliver the assessment books, map books, statements and military roll to the county clerk for use during the session of the board of equalization. It is therefore presumed that this board had these records before it during its 1930 session. They became competent evidence to be considered during any hearing. In the absence of any affirmative showing that the contents of these records were not considered at the hearing in question we must

presume that they were considered in arriving at a decision in the proceeding here involved.

Appellant produced undisputed evidence that its own property bounding the twenty-nine sections in question on the east was so entirely similar in character that the dividing line between the properties could not be determined upon the ground. It cannot be disputed that the increase in assessed valuation of the sections adjoining this line on the west by 2.3 times, created a marked inequality between the assessed valuations of these sections and the assessed valuations of the sections adjoining this line on the east. The troublesome question presented by this state of the record is answered for us in the case of *Wild Goose Country Club* v. *County of Butte, supra,* in which a hearing was denied by the Supreme Court. There the plaintiff's lands were in 1919 and 1920 assessed at $50 an acre. Exactly similar adjoining lands were in 1919 assessed at from $10 to $15 an acre and in 1920 at from $25 to $40 an acre. The court upheld the assessment, holding that as plaintiff's land was not assessed at more than its value and not more than the average percentage of value prevailing in assessments in Butte County, the mere fact of the inequality shown did not render the plaintiff's assessment void. In its opinion the court said: ''If the inequality complained of be conceded, and even if it be assumed, contrary to the fact, that the plaintiff offered to prove such inequality before the board, there is high authority to sustain the conclusion that the failure of the board to raise the assessment on surrounding lands in 1919, under the circumstances stated, did not constitute fraud or 'something equivalent to fraud'.'' In an opinion denying a rehearing it was said (p. 347): ''The members of the board had a choice of three courses: (1) To reduce plaintiff's assessment to that of the adjoining lands, thus relieving plaintiff of a large part of its just share of taxes, at the expense of all other taxpayers whose lands were assessed at the same relative value as plaintiff's; (2) to make a horizontal reduction in the assessment of all property except that which was undervalued; (3) to let the assessment stand, as they did, and correct the inequality the following year. The burden of proof was on the plaintiff to show fraud or its equivalent and it cannot be said, under the evidence, that

the action of the board, in adopting the third rather than either of the other courses open to it, constituted fraud or the equivalent of fraud.''

We must again advert to a comparison between the assessed valuations and the actual valuations of appellant's twenty-nine sections and those of the properties which we have designated as La Costa Downs. We have analyzed the figures on the various classification sheets with the following results which are not mathematically correct, but only approximations for the purpose of illustration. It would require too great detail to exactly compare the soil classifications used.

| Character of soils | Rancho Santa Margarita Properties | | La Costa Downs Properties | |
|---|---|---|---|---|
| | Per acre Tax Factors Valuations | Per acre Board of Equalization Assessment 1930 | Per acre Tax Factors Valuations | Per acre Assessed Valuations 1930 |
| Kimball Loams #1 all kinds tillable | $120.00 | $110.00 | $250.00 to $800.00 | $100.00 to $320.00 |
| Kimball Loams #2 all kinds tillable | $ 80.00 | $ 73.60 | $115.00 to $800.00 | $ 46.00 to $320.00 |
| Los Flores Loams #2 tillable | $ 25.00 to $ 40.00 | $ 23.00 to $ 36.80 | $ 40.00 to $ 70.00 | $ 16.00 to $ 28.00 |
| Los Flores Loams #3 tillable | $ 25.00 | $ 23.00 | $ 35.00 | $ 14.00 |
| Bluffs called sea-cliffs in La Costa Downs property | $ 2.00 | $ 1.84 | $800.00 | $320.00 |
| Rough, broken lands, marsh and creeks, nontillable | $ 2.00 to $ 5.00 | $ 1.84 to $ 4.60 | $ 5.00 to $200.00 | $ 2.00 to $ 80.00 |

It should be observed that the very few acres of Kimball Loams #2 in La Costa Downs property are valued at less than $200 per acre and assessed at less than $80.00 per acre. The bluffs or sea-cliffs and the nontillable, rough, broken land, marsh and creeks in La Costa Downs property are of very limited area. The Kimball Loams seem to prevail there. Roughly speaking, the percentages of soils there are

as follows: Kimball Loams, 72.4 per cent; other loams, 10.5 per cent; other land, 17.1 per cent. If the estimates of Tax Factors Inc. as to the actual values of the La Costa Downs properties be accepted as fair, the assessments placed on appellant's property by the board of equalization do not seem so unfair and discriminatory as to indicate that something akin to fraud actuated that body in making its raise in 1930. Mathematical exactness in equality of assessments should not be required and would be extremely difficult to obtain because of the lack of exactness of similarity of properties to be compared.

If we have been correct in saying that it is really the market values of properties that should be compared for assessment purposes, we must turn our attention to the evidence before us, other than that furnished by Tax Factors Inc. as to the values of the properties in question.

Appellant relied chiefly on the reports of Tax Factors Inc. Respondent produced many witnesses on the question of values. Some of them seemed to view appellant's property through the eyes of the enthusiastically optimistic promotional subdivider. One of them was so confident of the tremendous growth of the locality and its subdivision into "view lots" occupied by the villas of those able to spend their declining years in the peace and beatitude of that most charming country, that he placed a substantial front foot value on all the sixteen miles of the property that would fix its actual market value at a number of million dollars. If we reject this vision as too remote of probable realization to form any sound basis of present valuation, there remains ample testimony in the record which would support the conclusion of the board of equalization and the trial court that the actual values of appellant's properties were not so much less than that of the La Costa Downs area as to make the increase of the assessments by the board of equalization so unequal and discriminatory as to be proof of something akin to fraud in the action of the board of equalization in July, 1930, in question here.

The answer of respondent set up as an affirmative defense that the tax paid by appellant was not more than a fair and just proportion of the taxes assessed and levied for the fiscal year 1930–1931, which it should have paid on its

property. The trial court refused to find on this defense and appellant assigns this as reversible error.

We have searched the record and can find no evidence upon which a finding could be based. We have studied this defense in the answer and while it is couched in uncertain language we assume that it was intended to allege that the taxes paid by appellant bears no greater proportion to all the taxes paid in San Diego County than the assessed valuation (or the valuation) of its property bears to the total assessed valuation (or the valuation) of all the property in the county. There is nothing in the record showing either the total taxes paid or the total assessed valuation (or the valuation) of the property in San Diego County. A finding is not necessary upon an issue where there is no material evidence in the record to support such a finding if it were made. (*New Blue Point Min. Co.* v. *Weissbein,* 198 Cal. 261 [244 Pac. 325, 45 A. L. R. 781].)

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 24, 1933, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 4, 1934.