**TRINITY INDEPENDENT SCHOOL DISTRICT, Appellant,**

v.

**WALKER COUNTY et al., Appellees.**

**TRINITY INDEPENDENT SCHOOL DISTRICT, Appellant,**

v.

**TRINITY COUNTY et al., Appellees.**

**Nos. 12940, 12941.**

Court of Civil Appeals of Texas. Galveston.

Feb. 16, 1956.

Rehearing Denied March 8, 1956.

recover certain moneys which the plaintiff school district claimed as its own and which it alleged the Commissioners Courts of the respective counties had diverted from it and paid over to other school districts of the respective counties. The defendants in the two cases other than the counties are other school districts to whom it is claimed the funds were diverted. The funds involved are those paid the State of Texas from the proceeds of the national forests under the authority of Chapter 2, § 500, Title 16 U.S.C.A.

A proper disposition of the cases requires us to determine the true intent of the Legislature in enacting Sec. 1 of Chapter 19 of the Acts of the 49th Legislature 1945, now known as Article 2351b–4, Vernon's Ann.Civ.Tex.St., allocating and prorating the funds received by Texas from the Federal Government under the terms of the Federal statute.

The litigation arises because no part of the Federal forest lands lies in plaintiff school district. The defendant Commissioners Courts construe Art. 2351b–4 as directing payment of the allocated funds only to those school districts of the counties embracing Federal forest lands. Plaintiff school district contends this is incorrect.

P. H. Cauthan, Jr., Trinity, and Joe J. Newman, Houston, for appellant.

John W. Phillips, County Atty. of Walker County, and Reginald Bracewell, Huntsville, attys. for appellees Walker County and others.

Albert Hutson, Jr., County Atty. of Trinity County, Groveton, and McClain & Harrell, Conroe, attys. for appellees Trinity County and others.

GANNON, Justice.

These two appeals are brought by Trinity Independent School District from adverse judgments of the trial court in two suits brought by Trinity Independent School District against Walker County et al. and Trinity County et al., respectively, to

The Federal law was enacted in 1907 and provides for the payment to the several states in which national forests are located of 25% of moneys realized from the forests. When a national forest lies in only one state, the entire 25% of the receipts from that forest goes to such state, but in the case of national forests located in more than one state the distributive share of each is in proportion to the area of the forest in each state. Chapter 2, § 500 of Title 16, further provides for an allocation as between counties in a single state and for a ceiling on the amount to be paid any particular county of not more than 40% of the total income of the county from all other sources. The Federal legislation makes the state the original recipient of the payment but directs the expenditure of the fund by the state in aid of public

education and public road building in the various counties. The national statute reads:

"Twenty-five per centum of all moneys received during any fiscal year from each national forest shall be paid, at the end of such year, by the Secretary of the Treasury to the State in which such national forest is situated, to be expended *as the State legislature may prescribe for the benefit of the public schools and public roads of the county or counties in which such national forest is situated:* Provided, that when any national forest is in more than one State or county the distributive share to each from the proceeds of such forest shall be proportional to its area therein: Provided further, That there shall not be paid to any State *for any county* an amount equal to more than 40 per centum of the total income of such county from all other sources."

It is contended by defendants that the moneys involved are in lieu of taxes. This contention is made generally without identifying the taxes in lieu of which the payments are made, i. e., whether only road and school taxes or any and all manner of taxes which the State or any of its subdivisions might be authorized to levy and might have seen fit to exact. Nor do defendants offer any explanation of why, if the payments are in lieu of school and road taxes, both and each, the Federal Government, while limiting the uses to which the funds may be put to education and road building, still permits the free interchange of funds in the nature of road taxes for educational purposes and of funds in the nature of school taxes for road purposes. Neither do defendants seek to explain why, if the payments are in lieu of taxes because, and only because, the presence of the national forests in the states operates to deny the states the right to tax forest lands for any and all purposes as in its sovereign judgment the state might see fit, the national Government still limits the uses to which the funds may be put to education and road building.

It is the plaintiff's contention that the subject moneys are not in lieu of taxes but are a pure grant in aid of the inhabitants generally of the various counties to be used only within the counties and only for the purposes limited, as in the judgment of the state as trustee may seem best. This contention comports with the widely understood basic idea of a trust with donor, trustee, and beneficiary, the trust conferring discretion upon the trustee to direct the expenditure of the funds for the stated purposes, either or both, as in the judgment of the trustee may seem wise. Under such concept, the Federal Government is donor, the State Government is discretionary trustee, and the counties, or less literally the inhabitants of the counties, are the beneficiaries, and the prescribed purposes are education and road building. In this connection, it is to be noted that the Federal allocation of national forest receipts, after division between states, is only as between counties within a state. When we consider this definite allocation as between counties within a state in the light of the language of the statute providing that the funds are "for the benefit of the public schools and the public roads of the county or counties" and when we further consider that by the Federal statute the only discretion in allocating funds conferred on the state is as between purposes, no such discretion being conferred as between counties, the statute does seem to give considerably more evidence of the establishment of a true trust to carry out a wish and desire of the donor than of a payment in lieu of taxes. If the payment provided for be in lieu of taxes, it would appear the Federal Government has recognized an equity of the State because of being deprived of what but for the presence of the national Government would be its untrammeled right to levy taxes on the national forest lands, but still has fallen far short of recognizing at the same time the normal and natural right of a sovereign state to levy taxes for what purposes it will. Surely, the payments are not in lieu of taxes generally. Equally as surely, it would appear they are not in lieu of school taxes as such or road taxes

as such, for the State is free to direct the payments to be used for the one purpose to the exclusion of the other. So, if the payments be in recognition of the deprivation of the right of a sovereign state or a subdivision of such a state to levy taxes by reason of the presence of the national forests within the state, then such recognition would appear to be a most restricted one bordering on the haughty and overbearing; that is to say, since a payment in lieu of taxes connotes restitution, as it were, it would seem unnatural for one sovereign, in making restitution to another, for the restitution to be accompanied by directions for its restricted use to limited purposes within a circumscribed area of the payee sovereign. In short, it is difficult to explain why one sovereign would be willing to deal with another on the basis of such submission. On the other hand, if the idea of a trust be accepted, the arrangement provided by the Federal statute seems natural and right. And, if the statute be but late evidence of an early desire by the Federal Government to aid the inhabitants of local areas upon which the impact of its presence falls most heavily, then the trust idea is well nigh inescapable.

It is true that in Hagar v. Reclamation District, 111 U.S. 701, 4 S.Ct. 663, 670, 28 L.Ed. 569, following Mills County v. Chicago, B. & Q. R. Co., 107 U.S. 557, 2 S.Ct. 654, 27 L.Ed. 578, there is a ruling that certain donations of land by the Federal Government to the state for limited purposes, as provided in the Arkansas Swamp Act of September 28, 1850, 9 Stat. 519, did not impose on the donation "a trust following the lands", nevertheless, it is clearly implied that such donations did establish trusts, the faithful execution of which rested "solely in the good faith of the state." Nor is the language of the Federal Supreme Court, in King County, Wash., v. Seattle School Dist. No. 1, 263 U.S. 361, 44 S.Ct. 127, 68 L.Ed. 339, wherein it was held that a donation under Title 16, Chapter 2, Section 500, did not create a trust *for the benefit of the several school districts of the several counties of the state in which the national forest lands were located,* at war with the idea that the Federal Act does create a trust for other beneficiaries.

The Swamp Act cases merely hold that no trust *running with the land* was created and the King County case merely holds that the particular school district involved in that litigation was not the beneficiary of whatever trust may have been created by payments pursuant to the Federal legislation. The decision proceeds on the idea that even assuming a trust, the appellee had no right to enforce it since it was not a beneficiary of the trust.

A clear holding that Federal payments or donations such as the payments involved here are trust funds for the sole use of definite beneficiaries appeared at a very early date in the opinion of the Supreme Court of Alabama in the case of Long & Long v. Brown, 4 Ala. 622, decided in 1843. That case required a construction of the Act of Congress of March 2, 1819, 3 Stat. 489, providing for the admission of Alabama into the Union. That Act provided that out of the public lands "the section numbered sixteen in every township, and when such section has been sold, granted, or disposed of, other lands equivalent thereto, and most contiguous to the same, shall be granted to the inhabitants of such townships for the use of schools." Observing that the legal title to the lands could not vest in the inhabitants of the township, since they had no corporate existence, the court held it to be the intention of Congress to vest the legal title in the State but in trust for the benefit of the inhabitants, respectively, of the various townships. In the course of the opinion, in speaking of the acceptance by the State of the legal title to the lands involved, the court said: "By the acceptance of this trust, the State impliedly stipulated to do those acts which were necessary to give full effect to the grant, and this trust it has faithfully executed."

Some of the lands held in trust by Alabama had been sold by the State of Alabama. The State of Alabama had apparently recognized the trust as one running with the lands and had made application to Congress to authorize the sale of the lands

"by the assent of the township, * * *—the proceeds of the sale to be invested in some productive fund." Congress granted such leave. Afterwards, Alabama passed legislation authorizing the sale of the lands with the assent of the various townships. Against this background, the Supreme Court ruled that an affirmative vote by the electors of a township assenting to the sale at an election for that purpose constituted a fair expression of the wishes of a majority of all of the inhabitants. One cannot read Long & Long v. Brown, supra, and be left in doubt on the proposition that by the donation of the public lands there involved, Congress created a trust with the State of Alabama as trustee and the inhabitants of the respective townships as beneficiaries, for the purpose of aiding public education in the several townships. As early as the Ordinance for the government of the territory of the United States northwest of the river Ohio, passed in 1787, Congress recognized the propriety of using Federal funds to encourage schools and the means of education in promotion of religion, morality and knowledge, all being declared necessary to good government and the happiness of mankind.

██ From what has been said, it is clear, we feel, that Chapter 2, § 500, Title 16 U.S.C.A., evidences no intention on the part of Congress to make payments in lieu of taxes, but rather a friendly purpose to create trusts for the benefit of counties in which national forests are located, in recognition of the national interest in education and road building. Differently put, we feel the Federal enactment evidences a congressional intent to discharge, in a manner and to an extent seeming fit to it, a Federal, moral, and civil obligation to promote education and the construction and maintenance of public roads.

Before leaving the Federal statute, we observe that if the payment may in any view be said to be in lieu of taxes as distinguished from a pure grant, it must be said to be in lieu of school and road taxes; yet, in providing for a ceiling on the amount to be paid any particular county in a state, the maximum is not related to either school taxes or road taxes or the sum of both, but rather to the total income of the county from all sources. If the payments be in lieu of taxes, then, since plainly they are in lieu of school and road taxes only, it is difficult to see why Congress would relate the maximum to be paid a particular county to the revenue of that county *from all sources* rather than to some measure, however rough and ready, of the school and road taxes they are claimed to be in lieu of.

[2] From what has been said, it is apparent we are of the view that there is a distinction between pure grants and payments in lieu of taxes and that the payments contemplated by Chapter 2, § 500, Title 16 U.S.C.A., are of the former class, and that such payments when received by the State are taken by it for the benefit of all of the inhabitants of a particular county as an aid to education and road building in the county, the State being free, however, to determine as between the two purposes upon the expenditure of the fund in any proper manner as to it may seem wise and in the best interest of the county generally. Had the national legislature had in mind a more circumscribed class of potential beneficiaries, as it were, than any or all of the public schools of the various counties, and had it been the national intention that the payments contemplated were to be used when expended for education only for the benefit of those public school districts lying in whole or in part within the area of the national forests, it would have been easy to have said so. Yet one looks in vain for any expression, any word, any phrase, any sentence in the national legislation which militates against the idea that the intended beneficiaries of the trusts established by the national Government are other than the entire inhabitants of the several counties. Congress used language at once apt to express such purpose and inapt to express any other. In fact, when the Federal statute is read from its four corners without predilection for the idea that the payments are in lieu of school and road taxes, it is inescapable that the county as an entirety is the beneficiary of the trust. Note the language

of the proviso: "There shall not be paid to any State *for any county* an amount \* \* \*." Were a court to interpolate into the statute restrictive language to carve out of any county a portion thereof so as to exclude some of its inhabitants as potential beneficiaries of the Federal legislation, this would be a plain usurpation of the legislative prerogative. It has been in effect so held by the Supreme Court of Mississippi in State ex rel. Arrington v. Board of Sup'rs of Perry County, 1954, 221 Miss. 548, 73 So.2d 169, 172. There the claim was asserted that only those road districts of Perry County, Miss., in which the national forest lands were located were entitled to share in the road funds allocated by the Mississippi legislature to the various counties out of sums paid under Section 500, Chapter 2, Title 16 U.S.C.A. In rejecting such contention, the court said: "The legislature, by the enactment of Chapter 195, Laws of 1952, has vested in the board of supervisors the authority to determine how the funds allocated for expenditure for the benefit of the public roads shall be expended. The legislature, as we have already stated, has not seen fit to require that the funds be apportioned to the several road districts or school districts in which the national forest lands are located according to the forest land acreage of each such district, and *in the absence of such statutory requirement the court has no authority to compel the board of supervisors to apportion the funds in that manner."*

This holding, in our opinion, is another clear judicial recognition that the areas of a county in which the national forest lands are situated are not, ipso facto, to be considered to have a beneficial interest in the fund to the exclusion of other areas in the county which include no part of the forest lands.

We have written at length on the Federal statute because we think it necessary to understand it properly in order accurately to weigh and construe and appreciate the significance of the language of the State enactment now carried as Art. 2351b–4, V.A.T.S., the proper interpretation of which is determinative of this appeal.

This enactment in its entirety reads as follows:

"Art. 2351b–4. National forests, prorating receipts from federal government

"Whereas Congress has heretofore passed a law which provides that thereafter twenty-five per centum (25%) of all moneys received during any fiscal year from each national forest shall be paid at the end thereof by the Secretary of the Treasury to the State or Territory in which said forest is situated to be expended as the State or Territorial Legislature may prescribe for the benefit of the public schools and the public roads of the county or counties in which the national forest is situated, and whereas the Legislature of the State of Texas has not prescribed any method for prorating said funds, now, therefore, be it enacted that the Commissioners Courts of the counties in Texas in which such national forests are situated are hereby authorized to prorate all such funds received and to be received from the Federal Government from timber and all other income derived from such lands as follows:

"Fifty per cent (50%) of such money received shall be allocated to the school districts in proportion to the area in said districts, and fifty per cent (50%) of same to the county for the benefit of the public roads in said county. Provided the Commissioners Court may transfer the fifty per cent (50%) received by said Court to the school districts. Acts 1945, 49th Leg., p. 29, c. 19, § 1."

We first observe that the State Legislature which enacted Art. 2351b–4 assumed a distinction between Federal moneys paid in lieu of taxes and Federal donations or gifts. That same Legislature enacted Art. 5248f providing for the disposition of Federal funds received by the State and directed that all such funds whether "in lieu of taxes *or* as a gift" be accepted by the State and deposited in the Treasury "to the credit of the General Revenue Fund." The use of the disjunctive "or" seems to us as significant as is the language of Art. 2351b–3 enacted in 1941 authorizing the Commissioners Courts of Texas counties to make

requests on the United States on behalf of their counties and political subdivisions within their counties "for the payment of such sums in lieu of taxes as the United States may agree to pay" and in consideration thereof to enter into agreements with the United States for the performance of services by the county and political subdivisions within the county. It is clear that this statute, Art. 2351b–3, classifies payments made to a county or political subdivision of a county by the United States under agreements for services rendered as payments in lieu of taxes. The expression "in lieu of taxes" to describe payments received by counties or political subdivisions thereof for services rendered under treaties with the Federal Government, it seems to us, contemplates that such funds have an attribute not common to donated funds and the distinction would seem to rest on the thought that payments in lieu of taxes are received as of right under contractual arrangements without strings attached; whereas, donations, particularly donations made in trust for the use of ascertainable beneficiaries, represent pure largess.

Another statute to which our attention has been directed is Art. 4366a enacted by the same Legislature which enacted Art. 2351b–4. This statute directs the disposition of moneys received by the State under Sec. 701c–3, Title 33 U.S.C.A. Such funds are indistinguishable in character from the funds received under Chapter 2, § 500, Title 16 U.S.C.A., but there is a marked dissimilarity of language between the State statutes making disposition of the respective funds. Art. 4366a clearly and explicitly establishes political subdivisions with tax levying authority in which lands acquired by the United States for flood control, navigation and allied purposes are located as beneficiaries of Federal funds received under Sec. 701c–3, Title 33 U.S.C.A., to the exclusion of other political subdivisions with the same tax levying authority in the same counties within which no part of the Federal lands from which the income arises are located.

Defendants would draw from the express and explicit provisions of Art. 4366a a legislative intent in the enactment of Art. 2351b–4 to reach the same results as those directed by Art. 4366a. However, when these statutes are considered in pari materia along with Art. 5248f and Art. 2351b–3, and in the light of the provisions of the Foundation School Program Act, particularly the proviso of Sec. 5, Art. 2922–16, we do not feel warranted in drawing the inference suggested since we feel that the several enactments considered together and in the light of each other point in the opposite direction.

The proviso of Sec. 5 of the Foundation School Program Act establishes a credit against the local fund assignment chargeable to each school district containing state university owned land, state owned prison land, *Federal owned forestry land,* Federal owned military reservations, or Federal owned Indian reservations. No such credit is established in favor of the school districts receiving payments from the proceeds of Federal lands acquired for flood control, navigation, and allied purposes, Art. 4366a, V.A.T.S., nor in favor of school districts which may receive moneys in lieu of taxes pursuant to compacts made by them or for their benefit with the Federal Government. The inclusion in the proviso of Sec. 5 of a credit to school districts embracing Federal forest lands and the failure to include a like credit in favor of school districts embracing Federal flood control and navigation lands would appear to evidence a legislative understanding that Art. 4366a, V.A.T.S. and Art. 2351b–4, V.A.T.S., contemplate the distribution of the two Federal grants, the subject matter, respectively, of Arts. 4366a and 2351b–4, to the beneficiaries of such grants in a different manner. If this be so, then there is no warrant for the assumption that Art. 2351b–4 contemplates the exclusion from the receipt of the Federal funds paid on account of forest lands of any school district of a county in which such lands are situate.

But the foregoing considerations aside, Art. 2351b–4 is to be interpreted and construed, if possible, primarily from its own language. We are free to interpolate

the language necessary to evidence an intent to restrict the beneficiaries of the fund to school districts in which national forest lands are located only if no other reasonable construction is possible.

Since it is clear that there would be nothing unreasonable in the Legislature establishing all of the school districts in the various counties as beneficiaries of the fund, and since all such school districts operate public schools, let us examine the statute literally. First, the preamble of the statute recognizes the Federal plan that the Federal moneys be expended "for the benefit of the public schools and the public roads of the county or counties in which the national forest is situated." The verbiage of the recital of the preamble clearly establishes all of the public schools of the county as beneficiaries of the Federal funds. There is no such restrictive language in the recital as "the public school districts of the county *in which the national forest is situated."* Second, when we come to the enacting clause of the statute, we find similar broad county-wide language, so to speak. It is to be noted that the statute first enacts an allocation "to the school districts" and then directs an apportionment of such allocation as between the districts. The allocation is completed by the phrase "to the school districts." There is no qualification of this broad allocation. We first find a qualification in directing the apportionment to the districts of the allocation which is related to "the area in said districts." Thus, we find, taking the language in its natural signification, that the expression "area in said districts" refers to the expression "to the school districts", which expression in turn is apparently used as synonymous with and points directly to the expression "for the benefit of the public schools * * * of the county or counties in which the national forest is situated."

When the language alone of the statute is looked to, and there is no indulgence in speculation as to the possible meaning of what we consider a clear, literal expression of the legislative intent, there would appear to be no reasonable grounds for finding any ambiguity in the statute, nor for ascribing to the Legislature an intent to exclude from the benefit of the Federal fund any school district "of the county or counties", that is to say, to segment a county on the basis of the presence in the various school districts of Federal forest lands. This, it seems to us, would require us to ignore legislative recognition in the recital that the funds are for the benefit "of the public schools * * * of the county * * * in which the national forest is situated." It is the presence in the county of the national forest lands which is the determinative factor, not the presence of such lands in a particular school district and this finds clear expression in the statement that the funds are for the benefit of the public schools of the county, not just some of the public schools of the county nor any particular public schools of the county. Such generality of language belies the narrow intent contended for by defendants and enables us, as we are required to do if possible, to determine the legislative intent from the face of the statute viewed from its four corners without resort to an interpolation which would make the statute read: "Fifty per cent (50%) of such money received shall be allocated to the school districts [*in which such national forest lands are located*] in proportion to the [*national forest*] area in said districts." To do this would bring us in collision with a paramount rule of statutory construction, which we quote: "Primarily the intention and meaning of the Legislature must be ascertained from the language of the statute read as a whole, that is from the entire context of the law. If the statutory language clearly and distinctly reveals the legislative intent, there is no occasion to look elsewhere. In such case, the intent is to be found *in the words of the statute and there can be no intent not found* therein or that is negatived thereby." 39 Tex.Jur., title "Statutes," Sec. 93, page 176. In support of this text, we quote the classical language of Chief Justice Phillips, found in Simmons v. Arnim, 1920, 110 Tex. 309; 220 S.W. 66, 70:

"Courts must take statutes as they find them. More than that, they should be willing to take them as they find them. They should search out carefully the intendment of a statute, giving full effect to all of its terms. But they must find its intent in its language, and not elsewhere. They are not the law-making body. They are not responsible for omissions in legislation. They are responsible for a true and fair interpretation of the written law. It must be an interpretation which expresses only the will of the makers of the law, not forced nor strained, *but simply such as the words of the law in their plain sense fairly sanction and will clearly sustain.*"

■ Were we not able, as we have held we are, to ascertain the true intent of the statute on its face and from its four corners, and were we free to turn to other aids to statutory construction, we would find early and contemporaneous departmental construction in support of the views above expressed.

On March 20, 1947, Honorable Price Daniel, then Attorney General, at the request of the County Auditor of Montgomery County, wrote Opinion No. V–93, reading as follows:

"National forest receipts received by a county under Title 16, Chapter 2, Section 500, U.S.C.A., and Article 2351b–4, V.C.S., for public school purposes should be prorated and transferred by the Commissioners Court to all school districts within the county in proportion to the area in said school districts. 'Area' as used in Article 2351b–4, V.C.S., means area of the school districts in the county."

As we have hereinabove pointed out and in addition to this early departmental construction and apparently acting in reliance upon it, there is also legislative construction—by a later Legislature, it is true—found in the Foundation School Program Act where in the proviso of Sec. 5 the local fund assignment of school districts containing national forest lands receives a credit on account of their presence, no such similar credit being allowed on account of the presence in the school districts of Federal lands acquired for flood control, navigation, and allied purposes, a percentage of the proceeds of which received by the State is actually allocated by the State only to those school districts in which lie such Federally owned lands.

Almost ten years after the enactment of Art. 2351b–4, the Honorable John Ben Shepperd, then Attorney General, wrote an opinion, No. S–121, overruling his department's earlier opinion, V–93, above quoted, reaching the conclusion that national forest receipts should be prorated to the school districts only in proportion to the national forest area in each district in relation to the total national forest area within the county. An examination of this opinion reveals that it assumes, without attempting to demonstrate, that "It is the obvious intention of the Congress and the Legislature to provide the funds above described in lieu of the taxes lost to the counties and school districts in which tax exempt Federal Government forest lands are located" and that such assumption is the sole basis upon which the opinion rests. Our study convinces us that the assumption is incorrect and we feel the earlier and much more nearly contemporaneous departmental construction to be on firmer ground, buttressed as it is by legislative construction much nearer in point of time than the 1954 opinion of Attorney General John Ben Shepperd. So, even if it be assumed that the statute is ambiguous, still, in our opinion, the proper application of the best and most reliable aids to construction of ambiguous legislation would require the ambiguity to be resolved in favor of the contention of the plaintiff school district.

At the hearing in the trial court, testimony was admitted over objection of plaintiff school district from the witnesses Frank White and Ernest Coker as to discussions before the House and Senate Legislative Committees which reported out the legislation now known as Art. 2351b–4. We seriously doubt that such testimony was admissible for any purpose, however our disposition of the case renders the question moot.

The defendants each and all pleaded the two and four year statutes of limitation, Vernon's Ann.Civ.St. arts. 5526, 5527. We are covinced the character of the cause of action asserted by the plaintiff district is subject to the bar of limitation and that the two year statute is applicable. Without laboring the point, we rest our views on Hatcher v. State, Tex.Com.App.1935, 125 Tex. 84, 81 S.W.2d 499, 98 A.L.R. 1213, opinion adopted by the Supreme Court. It was there held that school districts in holding funds in trust for school purposes are trustees for the local public as distinguished from the state citizenship generally, and that in the absence of a statute to the contrary, limitation is available against it in a suit for the recovery of taxes. We see no distinction between the stewardship of the school district of whatever Federal funds it may be entitled to and its stewardship of tax funds.

The trial court sustained an exception to the trial pleadings of the plaintiff district, ruling that recovery of all moneys "prior to the year 1952–1953," was barred under the two year statute. This ruling is in line with our views. However, the record is not in such shape that we are in position to apply it in this Court. Plaintiff's pleading is quite general without alleging the particular dates upon which the Commissioners Courts after receipt of the funds relinquished possession thereof and placed such possession in the defendant school districts. These dates we think would be determinative since the causes of action asserted by the pleadings in so far as money judgments are sought would not arise until the Commissioners Courts surrendered possession of the funds to the defendant school districts. An additional difficulty on the issue of limitation is that the transcripts do not carry the original pleadings of plaintiff districts nor show the date that the suits were instituted. On the other hand, only the date of the filing of plaintiff's first amended original petition is shown. That date may or may not be determinative. Though the parties have stipulated the amounts paid by the counties to the respective school districts for the years 1945–1954, both inclusive, during each of such years, still the specific dates of such payments are not stipulated. It is necessary, therefore, that the cases be sent back to the trial court for determination on a proper development of the facts of an application of the two year statute of limitation.

Plaintiff district in its pleadings asked for mandatory injunctions against the Commissioners Courts and the members thereof, requiring future action in line with our disposition. We are satisfied that the Commissioners Courts will respect the final judicial determination of the controversy and see no present need for the issuance of the injunctions prayed for. On the remand the trial court should dismiss the prayers for injunction without prejudice to the right to refile should actual need for such injunctive relief appear in the future.

Reversed and remanded.