**GEORGIA PACIFIC CORPORATION, Plaintiff,**

**v.**

**COUNTY OF MENDOCINO, Defendant.**

**INTERNATIONAL PAPER COMPANY, Plaintiff,**

**v.**

**COUNTY OF SISKIYOU, Defendant.**

**DIAMOND INTERNATIONAL CORP., Plaintiff,**

**v.**

**COUNTY OF TEHAMA, Defendant.**

**Nos. C–71 366, C–71 1722 and C–71 1723.**

United States District Court, N. D. California.

April 12, 1973.

Cooley, Crowley, Gaither, Godward, Castro & Huddleson, Paul A. Renne, Andrew Kopperud and John D. Hoffman, San Francisco, Cal., for Georgia Pacific.

Pillsbury, Madison & Sutro, Geo. A. Sears and John Hall, Jr., San Francisco, Cal., for International Paper Co. and Diamond International Corp.

Bagshaw, Martinelli, Corrigan & Jordan, with Leland H. Jordan, San Rafael, Cal., for defendants.

## MEMORANDUM OPINION

WOLLENBERG, District Judge.

### INTRODUCTION

The three cases in which this decision is rendered have been related and consolidated for purpose of trial on the merits. The questions of law and fact are identical, except insofar as No. C–71—366 challenges the valuation method used by the County of Mendocino in assessing a tax for the year 1970–71 against plaintiff Georgia Pacific Corporation (hereafter "Georgia"). A trial to the Court took place on November 13, 1972. All factual issues have been stipulated, except for questions of valuation. For a brief statement of the facts in the three cases, see the Opinion and Order Denying Plaintiffs Motions for Summary Judgment, Georgia Pacific Corporation v. County of Mendocino, 340 F.Supp. 1061, 1062–1063 (N.D.Cal. April 4, 1972). The stipulations upon which the three cases were tried are appended to this Opinion as Exhibits A and B, and are hereby incorporated as the Court's Findings of Fact.

The legal issues raised in these three cases were, for the most part, briefed, argued and ruled upon in plaintiffs' motions for summary judgment. The Court's prior opinion is, therefore, adopted as its Conclusions of Law as to all legal issues not specifically discussed in this Opinion. The following shall constitute the Court's Further Conclusions of Law on those issues which justify further consideration.

### I.

*The Taxability of Plaintiffs' Interest*

Plaintiffs do not concede, as the Court has concluded, that they have interests in timber standing on the property of the United States which are taxable as possessory interests under California law. See 340 F.Supp. at 1065–1068. They urge two further points after trial. Skate Creek Logging Co. v. Fletcher, 46 Wash.2d 160, 278 P.2d 1009 (1955), which the Court found not controlling as a matter of California law, is reasserted as being instructive on the issue of California law, and controlling on the issue of federal law. Plaintiffs contend, without giving any judicial or legislative citation, that the *Skate Creek* decision was not based on any peculiar features of Washington law. Contrary to plaintiffs assertion, it appears that the *Skate Creek* decision derives from an unusual rule of contracts law. In Washington, a vendee under a land sale contract acquires no title, legal or equitable, to the property. See Giustina v. United States, 190 F.Supp. 303, 312 (D.Or.1960). Hence, there would be no taxable interest until the sale was completed. The Court is aware of no similar rule under California law.[1]

Plaintiffs also urge that the recent decision of United States v. County of Fresno, No. 136452 (Superior Court, Fresno County, Nov. 6, 1972; Jan. 8, 1973) holding that Forest Service employees have no possessory interest in cabins furnished to them by the Forest Service should be conclusive of the California tax law issue. The decision of a

---

1. In any event, the Court does not find the brief decision in *Skate Creek* persua-
sive. It apparently has not been followed in any published decision.

state trial court is not binding on a federal court sitting in diversity jurisdiction. But in any event, the decision in *County of Fresno* is inapposite to the present case because of the employment relationship involved and the interests of the United States in furnishing the cabins.[2]

Plaintiffs' more serious contention is that regardless of whether taxable possessory interests exist under California law, the titles and interests in federal property conveyed by federal contracts are, in the first instance, a matter of federal law. The Court agrees that if the property of the United States were being taxed by defendants, the tax would, absent express Congressional authorization, violate the federal Constitution. McCulloch v. Maryland, 4 Wheat. 316, 425, 4 L.Ed. 579 (1819); Van Brocklin v. Tennessee, 117 U.S. 151, 177, 6 S.Ct. 670, 29 L.Ed. 845 (1886). An examination of decisions of the Supreme Court ruling on the taxability of private parties dealing with the United States indicates, however, that the rights granted to plaintiffs in the standing timber, and the concomitant rights to go upon, possess and use the national forest land for the purpose of removing timber are sufficiently remote from and incidental to the federal interest that they may properly be taxed.[3]

In United States v. Boyd, 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964) the Court summarized the rulings of its controlling earlier decisions as follows:

"The Constitution immunizes the United States and its property from taxation by the States, M'Culloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579, but it does not forbid a tax whose legal incidence is upon a contractor doing business with the United States, even though the economic burden of the tax, by contract or otherwise, is ultimately borne by the United States. James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155; Graves v. New York, 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927; Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3. Nor is it forbidden for a State to tax the beneficial use by a federal contractor of property owned by the United States, even though the tax is measured by the value of the Government's property, United States v. City of Detroit, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424, and even though his contract is for goods or services for the United States. Curry v. United States, 314 U.S. 14, 62 S.Ct. 48, 86 L.Ed. 9; Esso Standard Oil Co. v. Evans, 345 U.S. 495, 73 S.Ct. 800, 97 L.Ed. 1174; United States v. Township of Muskegon, 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436. The use by the contractor for his own private ends—in connection with commercial activities carried on for profit—is a separate and distinct taxable activity." 378 U.S. at 44, 84 S.Ct. at 1521.

The contracts involved in these lawsuits involve two distinct aspects. It may be that each aspect is sufficient in itself to support a finding that the plaintiffs' interests are taxable, but be-

2. See note 10, *infra*.

3. Plaintiffs contention that the taxes assessed under these contracts operate as an unconstitutional discrimination against the United States and parties with whom it deals has been fully discussed in the Order Denying Summary Judgment, 340 F.Supp. at 1071–1073.

 The further contention of Georgia that the tax imposed upon it and fewer than ten other timber operators on fifteen contracts constitutes an unequal application of the law in violation of Article I, § 11 of the Federal Constitution and California law (See Rancho Santa Margarita v. San Diego County, 126 Cal.App. 186, 14 P.2d 588 (4th Dist.1932)) is without merit. The record does not indicate that any of defendants taxed plaintiffs' possessory interests under federal timber contracts while simultaneously failing to tax the interests of other timber operators under similar contracts. It is immaterial that other counties have not chosen to levy similar taxes on interests in federal timber contracts. Defendants are responsible only for the equal application of the tax laws within their respective jurisdictions.

cause both aspects exist, the Court need not reach that question.

The first aspect is the right conveyed by the contract for plaintiffs to enter upon and use National Forest land to pursue their business. Under the contracts, plaintiffs felled trees marked by the Forest Service, cut the trees into logs, skidded the logs to a landing, marked and branded the logs and loaded them onto a truck bound for their mills. All this was accomplished on National Forest land. Plaintiffs contend that this use of National Forest land does not support a basis for state taxation because their activities were rigidly controlled by contract specifications, and because their right to use the land was non-exclusive. The Court cannot accept either contention.

Under the contracts, the Forest Service designated trees to be harvested, prescribed the location and construction standards for the access roads to such timber, and when the roads were built, approved compliance with the construction standards. The Service also determined whether plaintiffs' erosion control, slash disposal and obliteration of temporary roads were satisfactory. Such controls are necessary to assure that the timber operations under the contracts comply with the purposes for which national forests may be established and administered under 16 U.S.C. §§ 475 and 476. But the Government has not reserved such control over the activities and financial gain of plaintiffs that they could properly be called servants of the United States in agency terms. United States v. Township of Muskegon, *supra*, 355 U.S. at 486, 78 S. Ct. 483. Rather it has established conditions with which plaintiffs, as self-interested entities, must comply if they choose to avail themselves of the business opportunity of harvesting timber from Federal lands.

Nor is plaintiffs' reliance on the non-exclusive nature of the contracts persuasive. As plaintiffs point out, the sale areas were open to government personnel, hunters, grazers, and tourists, as well as plaintiffs' employees. Moreover, plaintiffs were periodically denied access to the sale areas because of the high fire weather index or wet roads, although others may have been permitted access at certain times. But plaintiffs were the only lumber companies permitted to bring in the heavy equipment needed for timber operations and, by the terms of the contracts, were the only operators permitted to harvest timber within the sale areas for the duration of the contracts.

The conclusion is inescapable that these contracts conveyed the exclusive right to use Federal land for commercial logging. "A tax for the beneficial use of property, as distinguished from a tax on the property itself, has long been a commonplace in this country. See Henneford v. Silas Mason Co., 300 U.S. 577, 582–583, 57 S.Ct. 524, 526–527, 81 L.Ed. 814." United States v. City of Detroit, *supra*, 355 U.S. at 470, 78 S.Ct. 474, 476. Moreover, plaintiffs have possessed Federal land in the sense that they have constructed temporary roads for their benefit and have maintained their equipment in the National Forests. "Lawful possession of property is a valuable right when the possessor can use it for his own personal benefit." City of Detroit v. Murray Corp., *infra*, 355 U.S. at 493, 78 S.Ct. at 461.

In addition to plaintiffs' right to use Federal lands, the contracts convey to plaintiffs a possessory interest in the standing timber within the sale area. Plaintiffs contend that their interest in the timber does not materialize until the logs have been scaled by Forest Service employees at plaintiffs' mills. Section B8.11 of the contracts so provides. Moreover, section B8.12 of the contracts provides that the liability for loss due to fire, wind, flood, insects, disease or similar cause shall be borne by the party holding title until the timber has been removed from the sale area. In addition, plaintiffs point out that the contracts provide only for an estimated volume of logs, and that purchasers typically cut significantly less than 100% of

the Forest Service's original volume estimates.

■ Inability to purchase 100% of the estimated volume is not determinative of the taxability of plaintiffs' interest in the standing timber. Rather, it is a factor which must be considered when evaluating the extent of the interests.

Nor is the retention of formal title to the timber by the United States until it has been cut, scaled and paid for inconsistent with the creation of a possessory interest in plaintiffs. In Tree Farmers, Inc. v. Goeckner, 86 Idaho 290, 385 P.2d 649 (1963) the court was called upon to determine whether plaintiff lumber company was the owner of logs which had been cut under a government contract for purposes of taxation under the Idaho County personal property tax. The contract was similar, if not identical, to the contracts here in question. Although the contract provided that title remained in the United States until the logs had been scaled—a process done by plaintiff outside the county and state—the court held that "the beneficial and actual property in the logs was vested in appellant, at the time of the assessment, and that the retention of title by the government was for scaling purposes and to insure compliance with the terms of the agreement." 385 P.2d at 653–654. See also Petition of Edward Hines Lumber Co., 196 Or. 420, 248 P.2d 720 (1952).

Although *Tree Farmers* involved an ad valorem tax on personal property, its holding that the title provisions of the contract did not govern for state tax purposes is equally applicable here. The courts in *Tree Farmers* and *Edward Hines* relied upon the decision of the Supreme Court in S.R.A., Inc. v. Minnesota, 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851 (1946). In that case a Minnesota property tax was challenged as applied to property sold by the United States to a private party. The Court held that where ownership of the beneficial interest in property has passed to the purchaser with legal title retained by the United States for security purposes, the

property is not exempt from state taxation. 327 U.S. at 570, 66 S.Ct. 749. The Court said:

"To say that the payment of the purchase price is a necessary condition precedent to the loss of federal immunity is to make the rule too mechanical. It should be sufficiently flexible to subject real private rights, disentangled from federal policies, to state taxation. This has been the holding in mining claims. Where beneficial interest has passed to a vendee, the retention of legal title does not give a significant difference from the situation of a deed with a lien retained or a mortgage back to secure the purchase money." 327 U.S. at 569, 66 S. Ct. at 756 (footnotes omitted)

The opinion in *S.R.A., Inc.*, cites the Court's earlier decision in Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941). In King & Boozer, the Court held that a building contractor operating on a cost-plus basis under contract with the United States was not immune from the Alabama sales tax as to building materials purchased by the contractor for the United States. The contract had a provision vesting title to all materials and supplies in the United States "upon delivery [by the seller] at the site of the work or at an approved storage site and upon inspection and acceptance in writing by the Contracting Officer." The Government's theory was that the purchases were made by and for the United States for purposes of immunity from state sales taxes. The Court rejected this argument, saying:

"But however extensively the Government may have reserved the right to restrict or control the action of the contractors in other respects, neither the reservation nor the exercise of that power gave the contractors the status of agents of the Government . . . . ." 314 U.S. at 13, 62 S.Ct. at 47.

In the present case, the record indicates that the timber is paid for by advance deposits prior to harvesting. Al-

though it is true that plaintiffs cannot enter the sale areas and determine independently which trees they will harvest up to the volume specified by the contracts, they are assured of the exclusive right to harvest whatever trees are suitable for cutting in accordance with 16 U.S.C. § 476. As plaintiffs concede, this is a valuable right.

The Court need not determine whether this right, standing alone, creates a taxable interest in the standing timber. Rather, the Court holds that this right of ownership, in conjunction with the exclusive right to use federal land for commercial logging operations, creates a possessory interest in the timber within the sale area and the land upon which it stands. This interest is sufficiently distinct from the fee interest of the United States to permit taxation by defendants.[4]

## II

### The Impact of 16 U.S.C. § 500

■ Plaintiffs strenuously argue that the Court's interpretation of the impact of 16 U.S.C. § 500 must be reconsidered in light of the legislative history of that law. The Court's analysis of the relationship between 16 U.S.C. § 480 and § 500, and the consequent impact of Wilson v. Cook, 327 U.S. 474, 66 S.Ct. 663, 90 L.Ed. 793 (1946), discussed at 340 F.Supp. 1068–1071 is challenged on the grounds that (1) § 480 only reserved state jurisdiction over persons, not property, and (2) the legislative history of § 500 is so clear that the only proper interpretation of § 500 is that it was intended to provide revenue "in lieu of taxes" to counties having national forests within their borders.[5] The Court rejects both arguments.

4. Plaintiffs' reliance upon United States v. Allegheny County, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944), is misplaced. "In *Allegheny* the Court emphasized that the tax against Mesta Machine Company was, in its view, a general property tax laid on government property as such. The Court pointed out that the State had 'made no effort to segregate Mesta's interest and tax it.' The question was expressly reserved whether the State could tax a person possessing government property for the possession and use of such property in connection with his own profit-making activities." City of Detroit v. Murray Corp., 355 U.S. 489, 494, 78 S.Ct. 458, 461, 2 L.Ed.2d 441 (1958). Since the adoption of Instructions for Using the Comparative Sales Approach for the Appraisal of Possessory Interests Arising from Contracts to Purchase Timber on Public Lands by the California State Board of Equalization, applicable in C–71–1722 and C–71–1723, it is apparent that the basis for measuring plaintiffs' interests under their contracts is "The full cash value of these possessory interests in the market value of the property rights of the purchaser." The problem of valuation presented in C–71–366 is somewhat different, since the State Instructions had not been adopted when Georgia's interest was taxed (See part III, *infra.*), but it is apparent that in all three cases, the county assessors did not base their valuation on the fee interest of the United

States, but on the plaintiffs' interests as created by the contracts.

Nor is Humble Pipe Line Co. v. Waggonner, 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964) apposite. Unlike the provisions of 16 U.S.C. § 480, the Louisiana statute giving land to the United States for Barksdale Air Force Base provided that the United States should have "the right of exclusive jurisdiction" over any land it "purchased or condemned, or otherwise acquired . . . for all purposes, except the administration of the criminal laws . . . and the service of civil process of said State therein . . . ." 376 U.S. at 371, 84 S.Ct. at 859 (footnote omitted). See 340 F. Supp. at 1069–1070, and part II of this opinion, *infra*.

As noted in the prior Order, 340 F. Supp. at 1065, the parties have not briefed the effect of taxation under Cal.Rev. & Tax.Code § 107. It would appear, however, from the language of the Code that with exceptions not here relevant, "possessory interests shall not be considered as sufficient security for the payment of any taxes." Consequently, there does not seem to be any possibility that defendants could look to the United States for payment of the taxes assessed in these cases.

5. 16 U.S.C. § 480 provides:
 Civil and criminal jurisdiction.
 The jurisdiction, both civil and criminal, over persons within national forests

Plaintiffs' first point is contradicted by the plain language of § 480: "the State wherein any such [reservation] is situated shall not, by reason of the establishment thereof lose its jurisdiction, nor the inhabitants thereof . . . be absolved from their duties as citizens of the State." Plaintiffs contend that this language gives the states jurisdiction to tax the *activities* of its citizens, by means of a privilege or license tax upon persons engaged in the business of severing timber, as the Supreme Court held in Wilson v. Cook, but not jurisdiction to tax the *property* or *property interests* of its citizens. There is no basis for so limiting the duties of citizens. To the contrary, personal property taxes have been upheld as applied to logs cut under Forest Service contracts substantially like those in the present case. See, e.g., Tree Farmers, Inc. v. Goeckner, 86 Idaho 290, 385 P.2d 649 (1963); Petition of Edward Hines Lumber Co., 196 Or. 420, 248 P.2d 720 (1952). Such taxes on property, whether real or personal, go beyond plaintiffs' narrow reading of § 480, but comport with a common sense understanding of the duties of citizens. If, as the Court has held, a possessory interest in real property exists, then the taxation of such an interest is authorized by § 480.

Plaintiffs' second argument is that the legislative history of § 500, when first enacted in 1906 and re-enacted in 1908 (raising the payment from 10% to 25%) plainly shows that the intent of Congress was to create a payment in lieu of taxes. If this were so, then the provisions of § 480 arguably would have no significance. Building on this premise, plaintiffs contend that in light of § 500, the taxes assessed by defendants constitute an impermissible double taxation. Alternatively, they contend that taxation of possessory interest in timber of federal land is discriminatory because there has been no equivalent taxation of possessory interests in timber on state forest land.[6]

An examination of the legislative history cited to the Court and other statements found in the Congressional Record does not indicate that in enacting or re-enacting § 500 Congress intended to foreclose the taxation of possessory interests in National Forests. The Court has found absolutely nothing which would so indicate.

Nor is it entirely clear that Congress enacted § 500 to provide a payment in lieu of taxes for any purpose. It appears from House of Representatives Report No. 4924, June 20, 1906, and from the statements of Senators Warren and Fulton on the Senate floor, 40 Cong. Rec. 7355 (1906), 42 Cong.Rec. 6058 (1908) that some members of Congress, at various times, believed that the purpose of providing payments under § 500 would be to give revenue in lieu of taxes to the counties having national forests

shall not be affected or changed by reason of their existence, except so far as the punishment of offenses against the United States therein is concerned; the intent and meaning of this provision being that the State wherein any such national forest is situated shall not, by reason of the establishment thereof, lose its jurisdiction, nor the inhabitants thereof their rights and privileges as citizens, or be absolved from their duties as citizens of the State.

16 U.S.C. § 500 provides:

Payment and evaluation of receipts to State for schools and roads.

Twenty-five per centum of all moneys received during any fiscal year from each national forest shall be paid, at the end of such year, by the Secretary of the Treasury to the State in which such national forest is situated, to be expended as the State legislature may prescribe for the benefit of the public schools and public roads of the county or counties in which such national forest is situated: Provided, That when any national forest is in more than one State or county the distributive share to each from the proceeds of such forest shall be proportional to its area therein. In sales of logs, ties, poles, posts, cordwood, pulpwood, and other forest products the amounts made available for schools and roads by this section shall be based upon the stumpage value of the timber.

6. See Order Denying Summary Judgment, 340 F.Supp. at 1071–1073.

within their borders. But Senator Newlands believed the 25% to be a gift, 42 Cong.Rec. 6057 (1908), and Senator Heyburn's support for the amendment raising the payment to 25% was grounded "on the principle that if we get this, although it is not all that we are entitled to, it is that much gained against this [National Forest] system." 42 Cong.Rec. 6058 (1908). Other senators felt that the payment was a compensation for removing the land from the possibility of development and settlement (Senator Bacon, 42 Cong.Rec. 6058–59), or compensation to help "pay the police officers to make arrests [and] stand the burden of the expense incident to impaneling a jury, and [trying the case] just as though the forest reserve did not exist." (Senator Carter, 42 Cong.Rec. 5924–5925 [1908]). Most striking, however, is the fact that many senators apparently did not pay any attention to, or could not hear, the debate.[7]

■ The Court hesitates to rely upon the statements of a few Congressmen for a determination of the intent of the entire Congress, especially when conflicting statements can readily be found. On this record, the Court cannot find that the intent of Congress was to establish a payment in lieu of .taxes, much less to preclude local governments from taxing owners of possessory interests in National Forests.

Several state courts, in interpreting 16 U.S.C. § 500 have held that the payments made thereunder constitute a public grant, rather than a payment in lieu of taxes. Board of Supervisors of County of Modoc v. Archer, 18 Cal.App.3d 717, 725, 96 Cal.Rptr. 379, 385 (3d Dist. 1971); Tree Farmers, Inc. v. Goeckner, supra, 385 P.2d at 651; Trinity Independent School District v. Walker County, 287 S.W.2d 717, 719–723 (Tex.Civ. App.1956). See also, School District No. 24J v. McCarthy, 244 Or. 379, 418 P.2d 817, 820 (1966) (dissenting opinion). In Trinity Independent School District, supra, the court posed several questions which were unexplained by the in lieu of taxes theory, but were fully consistent with its public grant theory:

"It is contended by defendants that the moneys involved are in lieu of taxes. This contention is made generally without identifying the taxes in lieu of which the payments are made, i.e., whether only road and school taxes or any and all manner of taxes which the State or any of its subdivisions might be authorized to levy and might see fit to exact. Nor do defendants offer any explanation of why, if the payments are in lieu of school and road taxes, both and each, the Federal Government, while limiting the uses to which the funds may be put to education and road building, still permits the free interchange of funds in the nature of road taxes for educational purposes and of funds in the nature of school taxes for road purposes. Neither do defendants seek to explain why, if the payments are in lieu of taxes because, and only because, the presence of the national forests in the states operates to deny the states the right to tax forest lands for any and all purposes as in its sovereign judgment the state might see fit, the national Government still limits the uses to which the funds may be put to education and road building." 287 S.W.2d at 720.

The court concluded that § 500 "evidences no intention on the part of Congress to make payments in lieu of taxes, but rather a friendly purpose to create trusts for the benefit of counties in which national forests are located in recognition of the national interest in education and road building." 287 S.W.2d at 722.

The public grant theory adopted in Trinity Independent School District, is

---

7. "Mr. Flint: 'I can not hear the colloquy which is going on between the Senator from Georgia and the Senator from Nevada.'

"Mr. Bacon: 'That is not at all astonishing, in view of the other colloquies which are going on all over the floor.' " 42 Cong.Rec. 6059 (1908).

firmly supported by the only Supreme Court decision construing § 500.[8] In *King County v. Seattle School District*, 263 U.S. 361, 44 S.Ct. 127, 68 L.Ed. 339 (1923), the Court heard the complaint of a school district which contended that it and the other districts within the county were entitled to one-half of the funds apportioned to King County under § 500. The Court held, *inter alia*, that the act does not create a trust for the benefit of the school district [9] such that it would be entitled to one-half of all revenues apportioned to the county each year. The Court said:

"The act does not direct any division of the money between schools and roads. Its language above quoted indicates an intention on the part of Congress that the state in its discretion may prescribe by legislation how the money is to be expended. No distribution to the appellee or any other school district is required. The public schools and public roads are provided and maintained by the state or its subdivisions, and the moneys granted by the United States are assets in the hands of the state to be used for the specified purposes as it deems best." 263 U.S. at 364–365, 44 S.Ct. at 128.

In view of the language of §§ 480 and 500, the interpretations Supreme Court has given that language in *Wilson* and *King·County*, the holdings of various state courts,[10] and the inconclusiveness

---

8. The only other federal court opinion the Court has found which construes 16 U.S.C. § 500 is the recent decision of the Court of Claims in *State of Alabama v. United States*, 461 F.2d 1324 (1972). The court held that amounts received from purchasers of timber from national forest pursuant to the Knutson-Vandenberg Act, 16 U.S.C. § 576b are not subject to the 25% payments made to the states under 16 U.S.C. § 500. Although the court was not called upon to define the § 500 payments, it repeatedly described them as "revenue sharing under §§ 500 and 501." 461 F.2d at 1328, 1329, 1330, rather than payments in lieu of taxes.

9. The opinion in *Trinity Independent School Dist.* speaks of "Trusts for the benefit of counties" while *King County* holds that there is no trust created for the benefit of school districts. The Supreme Court has apparently reserved broader discretion in the states than the Texas court thought was appropriate; but this broader discretion on the state level strengthens, rather than undermines, the Texas court's conclusion that the payments are not in lieu of taxes the counties could otherwise hope to raise, since the relationship of the Federal payment to county taxes becomes even more tenuous.

The Supreme Court of Washington, relying on *King County*, has even held that "16 U.S.C. § 500 . . . does not preclude the Superintendent of Public Instruction from including [§ 500 funds] in state equalization funds" rather than apportioning said funds solely to counties having national forests within their boundaries. *Carroll v. Bruno*, 81 Wash. 2d 82, 499 P.2d 876, 879 (1972).

10. Plaintiffs have cited no appellate decision, state or federal, which has squarely held that § 500 payments are in lieu of local taxes, and therefore bar local governments from imposing any kind of local tax. *Carroll v. Bruno, supra,* describes the payments as "contributions in lieu of taxes" but that description was made in passing, and was not necessary to the Court's analysis or holding. 499 P. 2d at 876.

Plaintiffs' only authority for their interpretation of § 500 is *United States v. County of Fresno*, No. 136452 (Superior Court, Fresno County, Nov. 6, 1972; Jan. 8, 1973). In that case, the court's primary holding was that, as a matter of California law, plaintiffs had no possessory interest in their use of Forest Service cabins while on duty. The case is distinguishable from this case in that plaintiffs were using the cabins solely at the pleasure of and for the benefit of the United States. See Finding of Fact No. 6, filed January 8, 1973. In an alternative holding, the court concluded on the basis of legislative history appended to the plaintiffs' brief, that § 500 was intended to be in lieu of taxes, and that payment of possessory interest taxes to defendant constituted double taxation in violation of Cal. Revenue Code § 102. This Court has not been apprised of the legislative history presented to Judge Pettitt. On the basis of the legislative history attached to plaintiffs' briefs in this case, and the Court's examination of the Congressional Record, the Court is constrained to dis-

of the statements made in Congressional debates, the Court sees no reason to reconsider its holding that payments under 16 U.S.C. § 500 are not intended to be in lieu of taxes, and do not bar imposition of the taxes on possessory interests here at issue.

### III.

*Valuation in No. C–71 366*

The Court's Order of April 4, 1972 and parts I and II of this opinion have disposed of all issues common to the three cases at bar. The only remaining issues relate to questions of valuation in C–71 366.[11] Georgia contends first that the method used by the county assessor to evaluate Georgia's interest under its Doan Ridge and Blands Cove contracts was incorrect. Even if the method was correct, Georgia asserts that three specific errors were committed. The total amount in dispute is $18,809.54.

 The standard of review to be employed by a California Court when a decision by a Board of Equalization is questioned is limited to testing the decision for arbitrariness, abuse of discretion, or failure to follow the standards prescribed by the Legislature. De Luz Homes, Inc. v. County of San Diego, 45 Cal.2d 546, 564, 290 P.2d 544 (1955). In applying this standard to Georgia's contention that the assessor employed an erroneous method of appraising the value of Georgia's possessory interest under the two contracts, the Court finds that the method used by the county assessor was satisfactory.

Georgia's contention that the assessor appraised only the value of standing timber to the land, rather than the value of Georgia's interest in the standing timber is incorrect. Moreover, Georgia's argument, as presented by counsel, and in the memorandum and testimony of George A. Craig before the Board of Equalization that the extent of Georgia's interest under the contract is limited to its opportunity to make a profit ignores the holding of the California Supreme Court in *De Luz, supra.* The fact that a change in the market for timber between the time Georgia entered its contracts and the lien date may have made it impossible for Georgia to profit from its operations under the contracts is irrelevant:

"Since the possessory interest must be assessed in accord with the standard of valuation applicable to all other property, its estimated value is the price it would bring if offered on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and *this hypothetical market price* is its value even though a sale of the property has not been made or contemplated." *De Luz, su-*

agree with the decision of the Superior Court insofar as it may indicate that § 500 payments would bar defendants in this case from taxing plaintiffs possessory interests.

11. Georgia is the only plaintiff which has exhausted its administrative remedies. On or about December 17, 1970, the Mendocino County Board of Equalization denied Georgia's application for a reduction in assessments, sustained the findings of the County's tax assessor and refused to cancel, lower, or otherwise adjust said assessments, except that the Board corrected a statistical error in the assessment on Parcel No. 1918 (the Doan Ridge Contract).

On November 13, 1972, Sierra Pacific Industries and Western Forest Industries Association filed an *ex parte* petition to appear as amicus curiae in this action. Upon examination of petitioner's proposed brief, the Court has determined that petitioner is primarily concerned with methods of valuation employed by the assessor and Board of Equalization of Mendocino County in No. 71–366, and with challenging the Instructions of the State Board of Equalization utilized in Nos. C–71–1722 and C–71–1723.

The State Instructions are not before the Court except insofar as they bear on the constitutionality of the possessory interest taxes in question. Petitioner has not added anything new to this issue. Petitioner's comments cannot be considered on the valuation question in C–71–366 because they were not raised before the Board of Equalization. For these reasons, the Court has determined that the *ex parte* motion should be, and is denied.

*pra,* 45 Cal.2d at 563, 290 P.2d at 555. (emphasis added).

The record does not indicate that the Board of Equalization acted arbitrarily or contrary to State law in refusing to adjust the valuation made by the county assessor. The Court so finds.

The first specific error charged by plaintiff is failure to adjust the stumpage value by 100% of the change in rates of the Western Wood Products Association Index. As plaintiffs point out, the valuation instructions subsequently adopted by the State Board of Equalization do require a 100% adjustment. The question, however, is not simply whether the assessor failed to utilize an adjustment standard subsequently adopted and in no way binding for 1970–71. Rather, the Court must now determine whether the action of the County Board of Equalization in affirming the valuation of the county assessor was arbitrary. The Court does not so find.

The testimony of Duane Wells, chief appraiser for the Mendocino County Assessor's Office before the Board of Equalization indicates that an attempt was made to compensate for the fluctuations in timber prices between the date of bids on the Doan Ridge and Blands Cove contracts, and the lien date in 1970. The method followed was to adopt the 50% adjustment provision provided for in the contracts. In addition, a 20% risk factor was subtracted from the adjusted value of the standing timber. The adjusted price thus derived was compared with the four other timber contracts within the county. Although none of these other contracts was of comparable magnitude to the Doan Ridge contract, they were, absent a showing by plaintiff to the contrary, a reasonable basis for testing the validity of the adjusted price independently arrived at as a measure of the full cash value of plaintiff's interests.

Mr. Wells also testified that his office relied heavily upon data supplied by the Forest Service. One instance of this reliance resulted in giving the benefit of any doubts as to the grade of timber standing on the lien date to plaintiff. If the Forest Service indicated that the grade of the remaining timber was lower than the initial estimates, the adjusted price was further lowered. If it appeared that the grade was higher than average, however, the adjusted price was not raised.

Defendant's reliance on the expertise of the Forest Service to help determine the value of plaintiff's interest does not appear unreasonable, especially for the tax year 1970–71. As plaintiffs have emphasized throughout this lawsuit, the taxation of possessory interest in timber standing on National Forest lands is a new enterprise. Consequently, the Court finds that the Board was not arbitrary in its refusal to adjust plaintiff's taxes because of the assessor's failure to adopt a 100% adjustment of price changes.

Plaintiff's second point is that defendant should have deducted the cost of constructing roads from the bid price of the contracts to arrive at the adjusted value of the timber, and thus to obtain the full cash value of plaintiff's interest. Plaintiff again cites the State Board instructions, which call for an adjustment for the costs of roads to the extent such roads are necessary to provide access to the timber. Defendant relies on the *De Luz* case, 45 Cal.2d at 567, 290 P.2d 544, for the proposition that the cost of improvements that revert to the lessor is part of the cost or purchase price of the possessory interest.

The approach taken by the State Board is, in the Court's view, a reasonable accommodation to the rule stated in *De Luz* and the realities of harvesting timber. The Court does not find, however, that the County Board acted arbitrarily by including the full cost of road construction. In any event, plaintiff has not cited the Court to anything in the record before the Board which would have facilitated a determination of what road costs could be termed permanent improvements, as distinguished from

road costs incurred solely to gain access to the sale areas.

Georgia's final contention is that the assessor erred in relying on Forest Service estimates of the volume of standing timber per species within each sale area to determine the adjusted value of the remaining timber on the lien date. The record indicates that the Forest Service estimates were made on the basis of actual samples. Nevertheless, Georgia contends that its own estimates, coupled with its records of the species of timber removed prior to the lien date constitute a better method of determining the value of the standing timber.

It appears that Georgia's cutting records do not materially aid in finding the quantity of each species standing since the cuttings Georgia would subtract from its estimate to determine the volume of standing timber would not tend to show the accuracy of its initial estimate. More important, however, is Georgia's failure to show that use of a pro rata formula based on the Forest Service estimate did not provide an accurate assessment of each remaining species under its contracts on the lien date. The Forest Service estimate provided evidence from which the Board could reasonably find that the assessor's per species valuation was correct.

For these reasons, none of Georgia's specific charges of error is accepted by the Court. The foregoing discussion in part III of this Opinion shall constitute the Court's findings of fact and conclusions of law on the issue of valuation in C–71 366.

## CONCLUSION

The Court, having considered all of plaintiffs' arguments in this Opinion and its prior Order, has determined that on the basis of the facts as stipulated by counsel and the evidence introduced at trial plaintiffs are entitled to take nothing in these actions. Defendant shall submit a form of judgment.

## APPENDIX A

Georgia-Pacific Corporation, Plaintiff,

v.

The County of Mendocino, Defendant.

C–71 366.

### STIPULATED FACTS

The following facts are agreed and stipulated between counsel for plaintiff Georgia-Pacific Corporation and counsel for defendant the County of Mendocino:

1. Plaintiff Georgia-Pacific Corporation (hereinafter referred to as "Georgia-Pacific") is, and at all times herein mentioned was, a corporation duly organized and existing under the laws of the State of Georgia, with its principal place of business in the State of Oregon.

2. Defendant the County of Mendocino (hereinafter referred to as "the County") is, and at all times herein mentioned was, a body corporate and politic of, is located within, and is a citizen of the State of California.

3. The amount in controversy exceeds $10,000.

4. Georgia-Pacific is, and at all times herein mentioned was, qualified to do business and doing business within the State of California.

5. On December 19, 1969, Georgia-Pacific entered into an Assumption Agreement with the United States, acting through the Forest Service, United States Department of Agriculture (hereinafter referred to as "the Forest Service"), under which Georgia-Pacific assumed all of the obligations of and succeeded to all the rights of F. M. Crawford Lumber, Inc., under certain contracts between said F. M. Crawford Lumber, Inc. and the Forest Service. Two of these assumed contracts (hereinafter referred to as the "Doan Ridge Contract" and the "Blands Cove Contract") related to timber which is located on lands of the United States lying within the boundaries of the County.

6. A copy of the Doan Ridge Contract is attached hereto as Exhibit A,

and is incorporated by this reference herein.

7. A copy of the Blands Cove Contract is attached hereto as Exhibit B, and is incorporated by this reference herein.

8. As of the lien date in March, 1970, the County's Tax Assessor, acting pursuant to his interpretation of the Revenue and Taxation Code of the State of California, including Section 107 thereof, placed on the Mendocino County Assessment Roll assessments against Georgia-Pacific on the grounds that Doan Ridge and Blands Cove contracts gave Georgia-Pacific a taxable possessory interest in land of the United States located within the boundaries of the County.

9. The following definition of "possessory interests," contained in the first paragraph of Section 107 of the Revenue and Taxation Code, was adopted in its present form in 1941:

"Possessory interests" means the following:

(a) Possession of, claim to, or right to the possession of land or improvements, except when coupled with ownership of the land or improvements in the same person.

(b) Taxable improvements on tax-exempt land.

10. During tax year 1942–1943, and in some or all tax years between then and tax year 1970–1971, Georgia-Pacific, its predecessors and/or others held contracts with the Forest Service to purchase logs produced from trees cut from lands of the United States located within the boundaries of the County. Such contracts were similar to the Doan Ridge and Blands Cove Contracts.

11. Prior to tax year 1970–1971, the County's tax assessor had never assessed a "possessory interest" ad valorem real property tax or any other ad valorem real property tax against Georgia-Pacific, its predecessors and/or such other holders because of such contracts.

12. During tax year 1942–1943 and in some or all tax years between then and tax year 1970–1971, Georgia-Pacific, its predecessors and/or others held contracts with the Forest Service to purchase logs produced from trees cut from lands of the United States located within the boundaries of numerous Counties of the State of California other than the County. Such contracts were similar to the Doan Ridge and Blands Cove Contracts.

13. Prior to tax year 1970–1971, the tax assessors of said other Counties had never assessed a "possessory interest" ad valorem real property tax or any other ad valorem real property tax against Georgia-Pacific, its predecessors and/or such other holders because of such contracts.

14. In determining the aforementioned assessments, the County's tax assessor valued the "possessory interests" of Georgia-Pacific under the Doan Ridge and Blands Cove Contracts at $1,021,920 and $47,680, respectively.

15. It is Georgia-Pacific's opinion that, assuming for the sake of argument that the Doan Ridge and Blands Cove Contracts constituted "possessory interests," as defined by § 107 of the Revenue and Taxation Code, in the land of the United States, the values of such interests were a negative $144,652 and a positive $17,482, respectively.

16. The aforementioned assessments are respectively described in the records of the County as follows: Assessment Parcel No. 1918, "POSSESSORY INTEREST IN LAND OF U. S. FOREST SERVICE", and Assessment Parcel No. 1949, "POSSESSORY INTEREST IN LAND OF U. S. FOREST SERVICE".

17. Pursuant to said assessments, taxes were levied by the County against Georgia-Pacific for the taxable year 1970–1971 in the amount of $19,306.27.

18. On or about August 25, 1970, within the time period provided by law, Georgia-Pacific filed a verified application for a reduction in said assessments to zero with the Board of Equalization of the County. Thereafter, on or about August 31, 1970, Georgia-Pacific paid

under protest as to the whole of each of said assessments to the County's Tax Collector the amount of said levies, and enclosed with said payment under protest a written statement of protest setting forth the grounds thereof.

19. The County's Board of Equalization held a hearing on Georgia-Pacific's application for a reduction to zero of said assessments on or about December 3-4, 1970, and Georgia-Pacific appeared through its attorneys at said hearing and protested the assessments made against it, the assessed values, and the method of determining and arriving at the same.

20. On or about December 17, 1970, the County Board of Equalization denied Georgia-Pacific's application, sustained the findings of the County's tax assessor and refused to cancel, lower, or otherwise adjust or equalize said assessments to zero, except that the Board corrected a statistical error in the assessment on Parcel No. 1918 (the Doan Ridge Contract) by reducing the full cash value thereof to $994,400, entitling plaintiff to a refund of taxes paid in the amount of $496.73, and making the amount of taxes paid under protest still in dispute in this case and held by the County $18,809.54.

21. Under California law, Georgia-Pacific had no further administrative recourse after its aforementioned Application to the Board had been denied.

22. Georgia-Pacific's operations under the Doan Ridge and Blands Cove Contracts proceeded as follows:

(a) The Forest Service designated trees to be harvested, prescribed the location and construction standards for the access roads to such timber, and when the roads were built, approved compliance with the road construction standards;

(b) Georgia-Pacific felled the marked trees;

(c) Georgia-Pacific cut the trees into logs, skidded the logs to a landing, loaded them onto a truck, marked and branded the logs, and hauled the logs to Georgia-Pacific's mill;

(d) At the mill Georgia-Pacific decked the logs for storage until they were ready to be processed by the mill;

(e) When Georgia-Pacific was ready to process the logs, it moved the logs into the mill, at which time an employee of the Forest Service scaled them, noted their species, and noted the contract under which they were cut;

(f) The Forest Service billed Georgia-Pacific on the volume of each species so scaled each month. The unit rate for each species was subject to variation in each calendar quarter under the provisions of the contract, fluctuating both upward and downward. The unit rate in effect at the time of scaling was the rate Georgia-Pacific paid for the logs.

23. Forest Service personnel determined which trees were to be felled, the location and quality of the access roads, and whether Georgia-Pacific's erosion control, slash disposal and obliteration of temporary roads were satisfactory.

24. The sale areas were open to Forest Service and other government personnel, hunters, grazers, and tourists, in addition to Georgia-Pacific's employees.

25. The Forest Service controlled access to the sale areas. It periodically denied Georgia-Pacific's operating employees access to the sale areas because of the high fire weather index or wet roads, while not always denying other persons, such as Forest Service personnel, grazers, hunters and tourists, similar access to the sale areas at the same time.

26. Under the contracts, if the trees were burned or otherwise damaged while still standing so that they were not merchantable or identifiable, then Georgia-Pacific did not have to fell them, even though the trees had already been marked by the Forest Service. Furthermore, the Forest Service did not need to mark replacement trees, although it in many cases does so.

27. Georgia-Pacific purchased no guaranteed volume of logs under the contracts. In fact, Georgia-Pacific was only able to purchase 81.6% of the For-

est Service's original volume estimate under the Blands Cove Contract, and estimates that it will be able to purchase significantly less than 100% of the Forest Service's original volume estimate under the Doan Ridge Contract (which is still in effect).

28. During the 1970–1971 tax year, the Doan Ridge and Blands Cove Contracts were the only contracts outstanding pursuant to which parties could purchase logs produced from trees standing on lands of the United States located within the boundaries of the County. During the same tax year, Georgia-Pacific Corporation paid a total of approximately $170,894 to the Forest Service for logs it had purchased under the Doan Ridge and Blands Cove Contracts. Of this $170,894 in revenues, the United States Department of Treasury paid, pursuant to the provisions of 16 U.S.C. § 500, approximately $43,724 (25%) in tax year 1970–1971 through the State of California to the Counties in which the Mendocino National Forest is located.

29. During tax year 1970–1971, the County received a total of approximately $45,272 in payments from the United States Department of Treasury out of the approximately $181,088 in revenues received by said Department from the Mendocino National Forest which were allocable to the County pursuant to the provisions of 16 U.S.C. § 500.

30. The County did not reduce the taxes assessed to Georgia-Pacific on the Doan Ridge and Blands Cove Contracts by reason of the payments the County received under 16 U.S.C. § 500.

31. On March 1, 1970 there were outstanding approximately four contracts held by various parties with the State of California to purchase logs produced from trees standing on land administered by the California Division of Forestry and located within the boundaries of the County.

32. The County did not assess any holder or holders of the aforementioned contracts with the State of California for "possessory interest taxes" during tax year 1970–1971.

33. During calendar year 1970, the State of California received approximately $1,251,832 in revenues from land administered by the California Division of Forestry located within the boundaries of the County. During tax year 1970–1971, the County received a total of $90,823 in payments from the State of California pursuant to the provisions of Public Resources Code § 4654.

34. On March 24, 1971, the State Board of Equalization adopted "Instructions for Using the Comparative Sales Approach for the Appraisal of Possessory Interests Arising from Contracts to Purchase Timber on Public Lands." Prior to said date and on March 1, 1970, no rules, regulations, guidelines or instructions specifically directed to the assessment of contracts such as the Doan Ridge and Blands Cove Contracts had been promulgated by the California State Board of Equalization, nor were any such rules, regulations, guidelines or instructions in effect.

35. On March 1, 1970 there were approximately 20,000,000 acres of land owned by the United States Forest Service located within the boundaries of a total of 39 counties in the State of California.

36. On March 1, 1970, the Forest Service held approximately 1100 separate contracts (excluding contracts involving a bid of less than $2,000) to sell logs produced from trees located in approximately 30 separate counties within the State of California.

37. During tax year 1970–1971, the holders of only 15 of the aforementioned 1100 contracts were assessed by two counties with a possessory interest tax, while the holders of the remaining contracts to sell logs produced from trees located in the remaining counties were not assessed.

38. On February 24, 1971, Georgia-Pacific filed an action in the Superior Court of the State of California for the County of Mendocino in which Georgia-

Pacific seeks to recover the same taxes which it seeks to recover in these proceedings. Georgia-Pacific filed this action upon advice of counsel in order to protect itself against the running of the Statute of Limitations. Georgia-Pacific has not prosecuted this action and does not intend to prosecute it as long as the action before this Court is proceeding. Said action is still pending in said Superior Court and it is agreed that the United States District Court may take judicial notice of all of the contents of the Superior Court file in said action.

Dated: November 6, 1972.

## APPENDIX B

International Paper Company,
 Plaintiff,
vs.
County of Siskiyou,
 Defendant. Civil No. C–71 1722
Diamond International
 Corporation,
 Plaintiff,
vs.
County of Tehama,
 Defendant. Civil No. C–71 1723

## STIPULATION

1. On March 24, 1971, the State Board of Equalization adopted "Instructions for Using the Comparative Sales Approach for the Appraisal of Possessory Interests Arising from Contracts to Purchase Timber on Public Lands." For purposes of legal issues in this litigation, the assessment principles set forth in the said Instructions were followed for the 1971–72 assessment year in all California counties which assessed an alleged possessory interest arising under Federal timber contracts to harvest timber from national forests (with minor variations in method not material to the legal issues herein).

2. Payments are made to counties in which national forests are located in accordance with provisions of 16 U.S.C. § 500. As a result of operations by International Paper Company during the 1971–72 assessment year under the Federal timber contracts in question, Siskiyou County will receive payments pursuant to 16 U.S.C. § 500 in the [estimat- 227,819 ed] amount of [$319,100.] As a result of operations by Diamond International Corporation during the 1971–72 assessment year under the Federal timber contracts in question, Tehama County will receive payments pursuant to 16 U.S.C. § 500 in the [estimated] amount 268,766 of [$306,300.] No reduction in taxes assessed in International Paper Company or to Diamond International Corporation on account of Federal timber contracts was made by Siskiyou County or Tehama County or any California county by reason of Federal payments to counties under 16 U.S.C. § 500.

3. No alleged possessory interest arising under a contract to harvest timber from California State forests was assessed to the purchaser thereof by any California county in the 1971–72 assessment year. Payments are made to counties in which State forests are located in accordance with provisions of section 4654 of the California Public Resources Code.

4. For the 1971–72 assessment year, International Paper Company was assessed the amount of $599,750 on alleged possessory interests in ten Federal timber contracts covering national forest timber in Siskiyou County. International Paper Company paid a property tax thereon in the amount of $45,613.

5. For the 1971–72 assessment year, Diamond International Corporation was assessed the amount of $285,730 on alleged possessory interests in three Federal timber contracts covering national forest timber in Tehama County. Diamond International Corporation paid a property tax thereon in the amount of $20,442.

Dated: September 29, 1972.